J. B. FERGUS *et al.* Appellees, *vs.* ANDREW RUSSEL *et al.* Appellants.

*Opinion filed November 6, 1915—Rehearing denied Dec. 18, 1915.*

1. INJUNCTION—*tax-payers may maintain bill to prevent misapplication of public funds.* Tax-payers have a right to maintain a bill in equity to prevent the misapplication of public funds, such right being based upon their equitable ownership of such funds and their liability to replenish the public treasury for the deficiency which would be caused by the misapplication.

2. SAME—*tax-payers may maintain bill to enjoin payment of funds from State treasury.* The right of tax-payers to maintain a bill to prevent the misapplication of public funds is not limited to the public funds of a municipal corporation, ·but they have a right to maintain a bill to restrain the State Treasurer and the Auditor from paying out moneys appropriated by the General Assembly upon the ground that the acts of the General Assembly were unconstitutional and void.

3. SAME—*appropriation of public funds by an unconstitutional statute is a misuse of such funds.* An appropriation of public funds in pursuance of an unconstitutional statute is a misuse of the funds, which may be restrained by injunction at the suit of a tax-payer. (*Burke* v. *Snively,* 208 Ill. 328, and *Jones* v. *O'Connell,* 266 id. 443, approved.)

4. CONSTITUTIONAL LAW—*section 16 of article 4 of the constitution construed.* The provision of section 16 of article 4 of the constitution that "bills making appropriations for the pay of members and officers of the General Assembly, and for the salaries of the officers of the government, shall contain no provision on any other subject," does not mean on any other subject than appropriations, but. on any other subject than that of appropriations for the pay of the members and officers of the General Assembly and for salaries of officers of the State government.

5. SAME—*appropriation bill for pay of salaries of officers of the State government must not include employees.* Appropriations for the pay of the· members and officers of the General Assembly and for .the salaries of the State officers must, under section 16 of article 4 of the constitution, be contained in a separate bill, which shall not include appropriations for the pay of employees.

6. SAME—*appropriations for salaries of State officers are invalid if contained in Omnibus Bill.* Appropriations for the salaries of officers of the State government are invalid if they are contained in the general Appropriation bill, commonly known as the

Omnibus Bill, and if the separate appropriation bill for the pay of officers and members of the General Assembly and for the salaries of State officers contains appropriations for other purposes the appropriations for such other purposes are invalid.

7. SAME—*General Assembly must follow constitutional definition of an office.* In making appropriations for the salaries of State officers the General Assembly must be guided by the definition of an office found in section 24 of article 5 of the constitution in order to determine who are officers and who are mere employees.

8. SAME—*constitutional definition of an office contains two essential elements.* The definition of an office found in section 24 of article 5 of the constitution contains two essential elements: First, that the position must be a public one, created either by the constitution or by law; and second, that the position must be a permanent one, with continuing duties.

9. SAME—*what is meant by a position created by law.* A position created by law, as meant by section 24 of article 5 of the constitution, is one created by an act of the General Assembly passed for that purpose, and the mere appropriation of money for the payment of compensation to the incumbent of a specified position does not have the effect of creating an office or of giving such incumbent the character of an officer.

10. SAME—*how question whether position is permanent is to be determined.* If the duties of a position are continuing and it is necessary to elect or appoint a successor to the several incumbents, then the position is a permanent one within the requirement of the constitutional definition of an office, whether the incumbent of the position is elected or appointed and whether elected for a fixed term or appointed during the pleasure of the appointing power, and such a position is an office, provided it has been created by the constitution or by law.

11. SAME—*an appropriation to Governor for executive mansion expenses is not invalid.* The appropriation of 1915 of $13,000 per annum to the Governor for the care of the executive mansion and grounds and for heating, lighting, expenses of public receptions, wages and sustenance of employees, automobile and stable expense, and other incidental expenses of the executive mansion, is not for the personal expenses of the Governor or his family, and is not invalid as an attempt to increase the salary of the Governor, which is fixed by law at $12,000, "together with the use and occupancy of the executive mansion."

12. SAME—*appropriation for necessary traveling expenses of the Lieutenant-Governor not invalid.* The appropriation of 1915 to the Lieutenant-Governor for traveling expenses is lawful to the extent he is necessarily required to expend money for railroad fare

270 — 20

or other means of conveyance in performing his duties as presiding officer of the senate.

13. SAME—*appropriation to the Secretary of State for editing Blue Book is valid.* The appropriation of 1915 to the Secretary of State "for editing the Blue Book" is not an appropriation for the personal use of the Secretary of State nor for an additional compensation to him for services but is for money paid out by him in such matter and is a valid appropriation; and in like situation is the appropriation of 1915 to the Superintendent of Public Instruction for conducting certain examinations, setting questions and correcting manuscript.

14. SAME—*appropriation for telephone toll for members of the General Assembly is invalid.* The appropriation of 1915 of $2500 to the Secretary of State for telephone toll for members of the General Assembly is invalid, as in conflict with that part of section 21 of article 4 of the constitution which expressly limits all incidental expenses of a member of the General Assembly to $50 per session.

15. SAME—*appropriation, to be valid, must be for definite sum.* Under the constitution an appropriation, to be valid, must be for a definite sum, and an appropriation to the State Treasurer not for any specific amount but for "such sums as may be necessary to refund taxes on real estate sold or paid on error, and for over-payment of collectors' accounts under laws governing such cases," is invalid.

16. SAME—*Attorney General has all the common law powers and duties of that officer.* The constitution, by creating the office of Attorney General under its well known common law designation and providing that he shall perform such duties as may be prescribed by law, engrafted upon the office all the powers and duties of an Attorney General as known at common law, and gave the General Assembly power to confer additional powers and impose additional duties upon him but not to strip him of any of his common law powers and duties as the legal representative of the State.

17. SAME—*extent to which act of 1899 transferred powers and duties of Attorney General to the Insurance Superintendent.* The act of 1899, (Laws of 1899, p. 256,) which purports to transfer to to the Insurance Superintendent all the powers and duties of the Attorney General conferred and imposed upon him by the statutes relating to insurance, is valid only as to such additional powers and duties of the Attorney General as were not inherent in his office under the constitution.

18. SAME—*Insurance Superintendent must look to the Attorney General for legal services.* While the Insurance Superintendent, under the act of 1899, may institute prosecutions and maintain

any suits with reference to insurance which had formerly been prosecuted in the name of the Attorney General, yet he must look to and depend upon the Attorney General for all legal services in reference thereto.

19. SAME—*the Attorney General is the chief law officer of the State.* The Attorney General is the chief law officer of the State and the only officer empowered to represent the people in any suit or proceeding in which the State is the real party in interest, ex- ·cept where the constitution or a constitutional statute may pro- vide otherwise, and with this exception only he is the sole official adviser of the executive officers and of all boards, commissions and departments of the State government, and it is his duty to conduct the law business of the State, both in and out of the courts.

20. SAME—*appropriation to Insurance Superintendent for legal services is invalid.* The appropriation of 1915 to the Insurance Superintendent for legal services, and for traveling expenses of attorneys and court costs in prosecutions for violations of the in- surance laws, is unconstitutional and void.

21. SAME—*appropriation for expenses of prosecutions of vio- lations of law is valid—what not included.* The appropriation of 1915 to the Insurance Superintendent for expenses of prosecutions of violations of the insurance laws is valid to the extent of ex- penses legitimately incurred in conducting investigations in con- nection with such prosecutions; but this does not include fees for attorneys employed to perform legal services.

22. SAME—*the appropriations to certain State boards for prose- cuting violations of law do not include attorneys' fees.* The ap- propriations of 1915 to the Rivers and Lakes Commission "for prosecutions," and to the State Board of Pharmacy for "investigat- ing and prosecuting illegal sale of narcotic drugs," are valid, and cover legitimate expenses concerning such matters but cannot in- clude fees for attorneys.

23. SAME—*what is not the withdrawal of funds from the State treasury by resolution.* An appropriation contained in the Omni- bus Bill, if the bill is regularly passed, does not violate the provi- sion of the constitution against withdrawing funds from the State treasury by resolution, even though the committee for whose ex- penses the appropriation was made was created by resolution.

24. SAME—*appropriation for expenses of committee appointed by resolution to sit after sine die adjournment is invalid.* A com- mittee appointed by joint resolution of the General Assembly for performing duties after the *sine die* adjournment of the legislature has no power or authority to act except as the members may vol- unteer to act as private individuals, and an appropriation to pay the expenses of such a committee is invalid.

25. Same—*powers delegated by resolution cease with sine die adjournment of legislature.* All the powers of the legislature, as such, cease upon its final adjournment, and all the powers which have been delegated by it to a committee by mere resolution also cease; but the legislature has power, by an act regularly passed, to create a commission for any proper purpose, to act during the session of the legislature or after its adjournment.

26. Same—*Governor cannot approve part of an item and veto remainder.* The power given to the Governor by the constitution to disapprove of and veto any distinct item or section in an appropriation bill does not give him the power to disapprove of a part of a distinct item and approve the remainder, and if he vetoes part of an item by striking out the words "per annum" or by approving a part of the amount of one item and disapproving the remainder, his action is void and the whole item remains in force as passed by the legislature.

Farmer, C. J., and Craig and Duncan, JJ., dissenting.

Appeal from the Circuit Court of Sangamon county; the Hon. James A. Creighton, Judge, presiding.

P. J. Lucey, Attorney General, Lester H. Strawn, and A. R. Roy, (Logan Hay, of counsel,) for appellants.

A. A. McKinley, Charles H. Shamel, and Cyril W. Armstrong, for the Insurance Superintendent.

Fayette S. Munro, and Shelby M. Singleton, (John A. Watson, and Stevens & Herndon, of counsel,) for appellees.

Mr. Justice Cooke delivered the opinion of the court:

On July 9, 1915, J. B. Fergus, one of the appellees, filed his bill of complaint in the circuit court of Sangamon county against Andrew Russel, State Treasurer, to restrain the payment out of the State treasury of certain appropriations made by the Forty-ninth General Assembly of this State. A summons was issued and served upon Russel, as State Treasurer, returnable to the September term, 1915, of the circuit court. Thereafter, on July 31, 1915,

the complainant, by leave of court, filed an amended bill, and James J. Brady, Auditor of Public Accounts, was joined with the State Treasurer as a defendant to the suit. The appropriations attacked by the amended bill appear in an act entitled "An act to provide for the ordinary and contingent expenses of the State government until the expiration of the fiscal quarter after the adjournment of the next regular session of the General Assembly," approved June 29, 1915, in force July 1, 1915, (Laws of 1915, p. 203,) which act, pending its passage, was commonly referred to as the Omnibus Bill and is generally known by that title. On August 6, 1915, the defendants answered the amended bill, and it was stipulated that the cause should be heard at the May term, 1915, of the circuit court and should be considered and determined by the court upon the amended bill and answer. Before the court had announced a decision, Frederick W. Burlingham was, upon his motion, permitted to become a co-complainant and consented to be bound by all proceedings theretofore taken in the cause. Thereafter, on August 30, 1915, a decree was entered in the cause, finding that the appropriations made by the Omnibus Bill to the Attorney General for one assistant Attorney General in charge of the inheritance tax office in Cook county and for one clerk in said office; to the State Public Utilities Commission for chief grain inspector, for fourteen deputy grain inspectors, for four deputy grain inspectors, for one registrar, for three members of the appeal committee, for deputy chief inspector at East St. Louis and for four deputy inspectors at East St. Louis; to the State Board of Pardons for the secretary of the board; to the State Board of Health for the executive officer of the board; to the State Civil Service Commission for the secretary of the commission; to the Game and Fish Conservation Commission for extra wardens; to the Illinois State Board of Examiners of Architects for the secretary and members of the board; to the

State Board of Dental Examiners for the secretary of the board; to the Barbers' State Board of Examiners for the members of the board; to the State Inspector of Apiaries for the chief inspector; to the State Board of Pharmacy for the members of the board; to the State Fire Marshal for twenty-five deputy fire marshals; to the State Board of Examiners of Registered Nurses for the secretary and members of the board; to the Illinois Stallion Registration Board for the secretary and members of the board; to the Industrial Board for the secretary of the board; to the Board of Examiners for Horseshoers for the secretary and members of the board; to the State Board of Optometry for the secretary and members of the board; and to the State Board of Dental Examiners for the members of the board, are appropriations for salaries of officers of the State government and are unconstitutional and void because made by the Omnibus Bill. The decree further found that the appropriation of $2000 made by the Omnibus Bill to the Lieutenant-Governor for traveling expenses is unconstitutional and void because such appropriation increases the salary of the Lieutenant-Governor, and that the appropriation to the State Treasurer of such sum as may be necessary to refund the taxes on real estate sold or paid on error and for over-payment of collectors' accounts under laws governing such cases, to be paid out of proper funds, is void because no specific sum is appropriated for such purposes. The decree found that all other appropriations challenged by the amended bill are constitutional and valid. The Auditor is by the decree perpetually enjoined from issuing, and the State Treasurer from signing, honoring or paying, any warrants on account of any of the appropriations found to be unconstitutional and void. The State Treasurer and the Auditor of Public Accounts have prosecuted this appeal, and urge as grounds for reversal of the decree, first, that the complainants have shown no such interest in the subject matter of the suit

as entitles them to maintain this action; and second, that the court erred in holding each of the appropriations above specified unconstitutional and void.

The appellees, Fergus and Burlingham, have assigned cross-errors calling in question the action of the circuit court in holding constitutional and valid the appropriations made by the Omnibus Bill to the Attorney General for three other assistants in the inheritance tax office in Cook county; to the State Public Utilities Commission for assistant secretaries, five private secretaries to commissioners, librarian and historian, assistant counsel, three attorneys, two assistant attorneys, assistant chief engineer, chief engineer railroad division, assistant engineer railroad division, chief engineer accident division, chief engineer gas division, chief engineer electrical division, chief engineer telegraph and telephone division, chief engineer service division, mechanical engineer, thirteen assistant engineers, chief accountant, four assistant accountants, five assistant statisticians, utility rate expert, assistant utility rate expert, transportation rate expert, four assistant transportation rate experts, two assistant grain inspectors, two supervising grain inspectors, chief grain clerk inspection division, chief grain clerk and supervising inspector at East St. Louis; to the State Board of Live Stock Commissioners for secretary, live stock inspector at Union Stock Yards, Chicago, two live stock inspectors at Union Stock Yards, Chicago, six State agents at Union Stock Yards, Chicago, two live stock inspectors at National Stock Yards, East St. Louis, and board of veterinary examiners; to the Insurance Superintendent for actuary, chief insurance examiner, three insurance examiners and attorney; to the State Laboratory of Natural History for biologist; to the State Entomologist for five assistant entomologists; to the State Board of Health for chief clerk, attorney and bacteriologist; to the State Food Commissioner for six food inspectors and two chemists; to the State Highway Com-

mission for road engineer, bridge engineer, township engineer, testing engineer, assistant testing engineer, thirteen assistant engineers, six junior engineers, chief clerk and resident engineers; to the State Geological Commission for director; to the Rivers and Lakes Commission for secretary of the commission; to the Mine Rescue Station Commission for six instructors; to the Illinois Waterway Commission for accountants and other appointees; to the Industrial Board for industrial examiner and attorney and others; and to the State Water Survey for director, engineer, assistant engineer, chemist and four assistant engineers; it being contended by the appellees that such appropriations are for salaries of officers of the State government and unconstitutional and void because made by the Omnibus Bill.

The cross-errors also call in question the action of the court in holding constitutional the appropriation of $13,000 made by the Omnibus Bill to the Governor "for the care of the executive mansion and grounds, and for heating, lighting, expenses of public receptions, wages and sustenance of employees, automobile and stable expense and other incidental expenses of the executive mansion," it being contended that such appropriation is an attempted increase in the salary of the Governor and is therefore unconstitutional; the appropriation of $2500 to the Secretary of State for "telephone toll for members of the General Assembly," it being contended that the constitution fixes and limits all incidental expenses of members of the General Assembly to $50 each; the appropriation of $2000 to the Secretary of State for "editing the Blue Book," it being contended that such appropriation is an attempted increase in the salary of the Secretary of State; the appropriations to the Superintendent of Public Instruction of $1500, each, for "conducting three county examinations," of $4500 per annum for "setting questions and correcting manuscripts," of $250 per annum for "conduct-

ing State examinations, setting questions and correcting manuscripts," and of $1400 for "conducting examinations for medical colleges," it being contended that such appropriations are increases in the salary of the Superintendent of Public Instruction; the appropriations to the Insurance Superintendent of $15,000 for "expenses of prosecutions of violations of the insurance laws," of $2000 per annum for "traveling expenses of attorneys, court costs *in re* prosecutions of violations of the insurance laws," and of $4000 per annum for "legal services," it being contended that these appropriations are for services and expenses which under the constitution belong to the office of Attorney General; the appropriation of $2500 per annum to the Rivers and Lakes Commission for "prosecutions," it being contended that the duty of prosecuting violators of the law rests upon the Attorney General; the appropriation of $3000 per annum to the State Board of Pharmacy for "investigating and prosecuting illegal sale of narcotic drugs," it being contended that such duty rests upon the Attorney General; and the appropriations of $28,500 for "the expenses of the Illinois Centennial Anniversary Commission," of $10,000 for "the expenses of the commission appointed under provision of House Resolution No. 21 of the Forty-ninth General Assembly," and of $3000 to the commission to codify building laws under the provision of Senate Joint Resolution No. 29 of the Forty-ninth General Assembly, it being contended that these appropriations are unconstitutional because all of said commissions were appointed by joint resolution instead of by an act passed in accordance with the provisions of the constitution; also because the Forty-ninth General Assembly has adjourned *sine die* and said commissions therefore have no legal existence; also because, by the terms of the resolutions under which said commissions were created, vouchers approved by the chairmen of the commissions are to be accepted by the Auditor

and warrants issued thereon, and said appropriations are to be expended by officers not recognized by law.

The claim is advanced by the appellants that a tax-payer cannot maintain a bill in equity to restrain the State Treasurer and the Auditor from paying out moneys appropriated by the General Assembly on the ground that the acts of the General Assembly making such appropriations are unconstitutional. Decisions from other jurisdictions are relied upon to sustain this proposition, and some of them do announce that doctrine. We have consistently held the contrary view and do not regard the question as any longer an open one in this jurisdiction as the law on this question is well settled in this State, and as we have no intention or desire to depart from our former holdings it will serve no good purpose to enter into a discussion of the cases cited by the appellants from other jurisdictions.

We have repeatedly held that tax-payers may resort to a court of equity to prevent the misapplication of public funds, and that this right is based upon the tax-payers' equitable ownership of such funds and their liability to replenish the public treasury for the deficiency which would be caused by the misappropriation. (*Colton* v. *Hanchett*, 13 Ill. 615; *Perry* v. *Kinnear*, 42 id. 160; *Chestnutwood* v. *Hood*, 68 id. 132; *Jackson* v. *Norris*, 72 id. 364; *McCord* v. *Pike*, 121 id. 288; *Littler* v. *Jayne*, 124 id. 123; *Stevens* v. *St. Mary's Training School*, 144 id. 336; *City of Chicago* v. *Nichols*, 177 id. 97; *Adams* v. *Brenan*, 177 id. 194; *Burke* v. *Snively*, 208 id. 328; *Jones* v. *O'Connell*, 266 id. 443.) It is the contention of appellants that in the cases in which this doctrine has been announced and in which the right of tax-payers to institute such suits has been sustained only public funds in municipal treasuries were involved and not the public funds in the State treasury, and that this is the first time in this State that the right of a tax-payer to bring a suit to enjoin the payment of the public funds from the State treasury has been

presented to this court. It may be conceded that some of the decisions from other jurisdictions relied upon by appellants make a distinction between the funds in a municipal treasury and the funds in a State treasury. Upon principle and reason we perceive no distinction between the right of a tax-payer to enjoin the misappropriation of the public funds from a municipal treasury and the right to enjoin an invalid appropriation of the public funds from the State treasury.

In discussing the rule laid down in this State as to the right of a tax-payer to bring a suit to enjoin the misapplication of public funds in a municipal treasury and in attempting to say that it has no application to such a case as this, appellants say in their brief: "We make no objection to this rule, but maintain that it has no application where the rights of the State are involved. The State is a sovereignty. It is inconceivable that the power and maintenance of the State organization can be attacked successfully by a mere private citizen. The courts are one branch of the State organization. The courts necessarily are bound to do nothing to embarrass the sovereignty of which they are a part. They will not, therefore, interfere in any manner with the acts of the legislative branch or of the executive branch in so far as those acts are a part of the sovereignty and reasonably necessary to the maintenance of the State organization."

A municipality has no inherent power to raise public funds by means of taxation, but such power is derived only by grant from the State. In exercising this delegated authority a municipality is exercising a part of the sovereign power of the State. The sovereignty of the State is no less involved, except in degree, in the determination of a suit brought by a tax-payer to enjoin the misappropriation of the public funds of a municipality than in a suit such as this, brought by a tax-payer to enjoin the misappropriation of the public funds in the State treasury.

While it may be true, as appellants suggest, that a case involving the precise facts here involved has never been presented to this court, the reasoning in each of the cases before cited is applicable and the holding decisive. In some of them the facts are analogous to those in the case at bar and the same contentions were urged as are here urged on the part of the appellants. In *Burke* v. *Snively, supra,* a bill in chancery was filed against the Commissioners of the Illinois and Michigan Canal, the Auditor of Public Accounts and the State Treasurer to restrain the payment out of the public funds of the State of certain sums of money appropriated by the General Assembly for the maintenance and protection of the Illinois and Michigan canal and for the necessary and extraordinary expenses thereof. That was a suit by a tax-payer, and it was there contended by the Attorney General that the circuit court of Sangamon county was without jurisdiction, as the action was against the State. This question was decided contrary to the contention of the Attorney General, and it was held that "in equity the money in the State treasury is the money of the people of the State, and suits by a tax-payer to restrain the misappropriation by public officers of such money to an unauthorized purpose are not suits against the State." It was also there held that an unconstitutional statute is not law, and an appropriation of public funds in pursuance of an unconstitutional statute is a misuse of the funds, which may be restrained by injunction, and that the Auditor of Public Accounts may be restrained from issuing warrants for the payment of the public money for any other than purposes for which said moneys may be lawfully used, and the treasurer of the State may be enjoined from paying public funds for purposes not authorized by law.

*Jones* v. *O'Connell, supra,* was a suit brought by a tax-payer to restrain the county treasurer of Cook county from appropriating to his own use two per cent of the inher-

itance taxes collected by him as such county treasurer and to require him to restore to the treasury of Cook county such amount as he had withdrawn over and above his annual salary and to pay the same over to the treasurer of the State. The complainant in that case was permitted to maintain his bill as a tax-payer because of his equitable interest in the public funds in the State treasury. In holding that a tax-payer may, on behalf of himself and other tax-payers, maintain a bill to enjoin the county treasurer from misapplying public funds in his hands and to compel him to restore to the State treasury the amount already misapplied where the money so misapplied must be made up by taxation, we said: "If tax-payers have a right or interest which the bill in this case was intended to protect it is of a purely equitable nature, the legal right and title being in the State. If the defendant, O'Connell, has money in his hands which he has no right to retain but which he is bound to pay to the State Treasurer, the sum retained by him must be made up by taxation, and every tax-payer has an equitable right to see that the money so unlawfully retained shall be paid to the State Treasurer for the use of the State. This court has always recognized that rule and has uniformly held that the tax-payers are in equity the owners of the property of a municipality, and whenever public officials threaten to pay out public funds for a purpose unauthorized by law or misappropriate such funds, equity will assume jurisdiction to prevent the unauthorized act or to redress the wrong; and this is because the right and interest are equitable in their nature and are not recognized by courts of law."

Appellants contend that the right of a tax-payer to maintain the suit was not raised in either *Burke* v. *Snively, supra,* or *Jones* v. *O'Connell, supra,* and what was said in those cases on this question was not necessary to a decision. We approve the doctrine announced in those cases, and under the rule as it has been uniformly recognized in

this State appellees have an undoubted right to maintain this suit.

It is charged in the bill that certain items appropriated in the Omnibus Bill are for the payment of the salaries of officers of the State government and are therefore uncon- stitutional and void. The section of the constitution which it is claimed prohibits the making of these appropriations in this manner is section 16 of article 4, which is, in part, as follows: "Bills making appropriations for the pay of members and officers of the General Assembly, and for the salaries of the officers of the government, shall contain no provision on any other subject." Appellants contend that this section of the constitution does not prohibit including other items of appropriation in bills appropriating moneys for the pay of officers of the State government, and insist that the proper and reasonable construction to be placed upon this section is, that the phrase "any other subject" refers to "appropriations" as its antecedent, and that the section should be interpreted as though it read: "Bills making appropriations for the pay of members and officers of the General Assembly, and for the salaries of the officers of the government, shall contain no provision on any other subject *than appropriations.*" In support of their contention appellants point out that in *Ritchie* v. *People,* 155 Ill. 98, *Mathews* v. *People,* 202 id. 389, and *People* v. *Joyce,* 246 id. 124, where this section of the constitution has been construed, the acts there respectively involved, besides attempting to appropriate money for the pay of State officers, included legislation upon other independent subjects. While it is true, as appellants contend, that in the *Ritchie case* the act under consideration also provided for factory inspection, that in the *Mathews case* the act there questioned also regulated free employment agencies, and in the *Joyce case* the act, in addition to creating a system of parole, also provided for pay for the parole agents, which in those cases made the acts involved obnoxious to this

section of the constitution, it does not follow that that was the only evil aimed at and intended to be prohibited by said section 16. The language employed in this section is plain and unmistakable, and was clearly intended to prevent the making of appropriations for the pay of salaries of officers of the State government in any bill which should contain a provision on any other subject than that of appropriations for the pay of members and officers of the General Assembly and for salaries of officers of the State government. It was no doubt the intention of the framers of the constitution, and of the people in adopting it, to make it impossible to influence legislation by the inclusion of the appropriation for the pay of members and officers of the General Assembly and for salaries of the officers of the State government, which are fixed in amount and must be paid, in bills which contain provisions upon any other subject whatever. While there may appear to be some force to the suggestion that an employee is as much a servant of the people as an officer and might not improperly be classed with an officer so far as the making of an appropriation for his pay is concerned, and also that by drawing a strict line between an officer and an employee and holding that the pay of no officer can be provided for in any other appropriation bill than one for the pay of members and officers of the General Assembly and officers of the State government a difficult task is set for the legislature to determine who are and who are not officers, we are not permitted to be influenced by such considerations or suggestions. Under this section of the constitution it is incumbent upon the General Assembly to make the appropriations for the pay of its members and officers and for the salaries of the officers of the State government by a separate bill or bills which shall contain no provision on any other subject than that of appropriations for such members and officers. In considering this section in *Ritchie* v. *People, supra,* we said: "The manifest intention of section 16

was to make the subject of appropriations for the pay of the members and officers of the legislature, and for the salaries of the officers of the government, a separate and distinct subject for legislative action." If, in fact, the Omnibus Bill contains appropriations for salaries of any of the officers of the State government such appropriations are invalid. This would not be true if the act were one making appropriations for members and officers of the General Assembly and for salaries of the State officers, as it is contemplated by the constitution such appropriations shall be made. In that event every other provision in the bill, aside from those making appropriations for such members and officers, would be invalid. (*Ritchie* v. *People, supra.*) The General Assembly passed a members' and officers' pay bill, (Laws of 1915, p. 70,) and if the pay for the salaries of all the officers of the State government is not included in that act it was no doubt the result of an error in judgment as to who were officers and who were employees under the definition contained in the constitution. The title of the Omnibus Bill does not indicate that it is a bill to appropriate salaries for State officers. Under the constitution a bill making appropriations for the pay of members and officers of the General Assembly and for salaries of officers of the State government must express that subject, and that subject alone, by its title. While the title of the Omnibus Bill, in its broadest sense, would no doubt include the pay of members and officers of the General Assembly and for salaries of State officers, it was not confined to those subjects but included every possible incidental and ordinary expense of the State government. The constitution prohibits the making of appropriations for the salaries of State officers in such a bill.

The appellants suggest that it must be shown that the threatened injury is substantial, and not merely of a nominal character, before appellees are entitled to relief in a court of equity, and urge that as every State officer re-

ceives a fixed compensation for his services, which cannot
be changed by the General Assembly and which must be
paid, appellees have sustained no substantive or positive in-
jury because the General Assembly, in attempting to dis-
criminate between an office and employment, has included
in a general appropriation bill appropriations for the sal-
aries of certain of the State officers. The constitutional in-
hibition against making appropriations for the salaries of
the officers of the State in this manner is positive and must
be observed. Should the General Assembly disregard it, it
becomes the duty of the Auditor to refuse to issue war-
rants for the pay of salaries so appropriated and of the
State Treasurer to refuse to pay the same, and if such
appropriations have been made in violation of this section
of the constitution those officers could not be coerced to
issue such warrants and pay the same out of the funds in
the State treasury. By the bill it is alleged that the Aud-
itor is about to draw certain warrants, and the Treasurer
to pay the same, upon the various items set forth in the bill
of complaint, and that unless restrained the items, or por-
tions thereof, will be paid and the complainants will there-
by suffer irreparable injury. Among the items set forth in
the bill are many which are alleged to be appropriations
made for salaries of various State officers in the Omnibus
Bill. If the Auditor and State Treasurer are about to is-
sue warrants and pay the same out of the State treasury
pursuant to an invalid appropriation, the tax-payers of the
State are entitled to relief by injunction although the in-
valid appropriations were intended to provide for the sal-
aries of the various State officers. It becomes necessary,
then, to determine who compose the officers of the State
government. This question is not left open to conjecture,
as section 24 of article 5 of our constitution contains the
following definition: "An office is a public position created
by the constitution or law, continuing during the pleasure
of the appointing power, or for a fixed time, with a suc-

270 — 21

cessor elected or appointed." This is an explicit definition and must serve as the only guide of the legislature in making appropriations for the salaries of the officers of the State government. This definition contains two essential elements, both of which must be present in determining any given position to be an office: (1) The position must be a public one, created either by the constitution or by law; and (2) it must be a permanent position with continuing duties. To determine whether the first element is present we have but to look to our constitution and our statutes to see whether the particular position under consideration has been created by the constitution or by law. An office is created by law only as a result of an act passed for that purpose. The mere appropriation by the General Assembly of money for the payment of compensation to the incumbent of a specified position does not have the effect of creating an office or of giving such incumbent the character of an officer, (*People* v. *McCullough,* 254 Ill. 9,) as an office cannot be created by an appropriation bill. To ascertain whether the second element is present it is necessary to determine the character of the position. This is not determined by the method in which the occupant or holder of the position is selected,—whether by appointment or election. If the duties of the office are continuing and it is necessary to elect or appoint a successor to the several incumbents, then the second element is present whether the incumbent be selected by appointment or by election, and whether the incumbent be appointed during the pleasure of the appointing power or be elected for a fixed term. Applying this definition and rule, we find that the circuit court correctly found the appropriations enumerated in the decree, and above set forth, to be appropriations for the pay of officers of the State government and improperly included in the Omnibus Bill and therefore invalid, with the exception of the appropriation for one clerk in the inheritance tax office of the Attor-

ney General in counties of the third class and the appropriation for extra game wardens. There is no provision either by the constitution or by statute creating the position of clerk in the inheritance tax office of the Attorney General in counties of the third class. This position, therefore, is not an office but the incumbent is an employee whose compensation may properly be provided for in the Omnibus Bill. Appellees cite and rely upon section 12 of the Inheritance Tax law (Hurd's Stat. 1913, p. 2101,) as the statute creating this position. This statute does not refer to a clerk in the inheritance tax office of the Attorney General but refers to an inheritance tax clerk in the office of the clerk of the county court.

By section 2 of the Game and Fish act (Hurd's Stat. 1913, p. 1295,) it is provided that the State Game and Fish Conservation Commission shall have power to employ such other officers, agents and employees than those therein designated as it may deem necessary for the efficient conduct of its business. The appropriation for the extra game wardens, as it appears in the Omnibus Bill, is as follows: "For extra wardens during game seasons, $15,000." This is plainly an appropriation for such other officers as the commissioners may deem it necessary to employ for temporary purposes, and their positions do not come within the definition of an office as it is contained in the constitution.

Further applying the constitutional definition and the rule we have deduced from it, we find that the court properly held all of the positions complained of by appellees in their assignment of cross-errors not to be offices except those held by three assistant Attorneys General in charge of the inheritance tax office in Cook county, the members of the Board of Veterinary Examiners and the director of the State Geological Commission.

Section 12 of the Inheritance Tax law provides that in counties of the third class the Attorney General shall designate an assistant (or assistants) Attorney General, whose

special duty it shall be to. attend to all matters pertaining to the enforcement of that act in respect to the appraisement, assessment and collection of the inheritance tax in such counties. The office of assistant Attorney General is thus created by the statute, and the duties of that office are continuing, with a successor to be appointed. It complies with the constitutional definition of an office. It may be that at times it will be necessary to have more incumbents of that office than at others, but the office and its duties continue, and the incumbents, no matter how many the necessities of the business of the State may require, are officers, and provision for the payment of their compensation cannot be made in any other manner than that provided by the constitution.

By section 2 of the act regulating the practice of veterinary medicine and surgery (Hurd's Stat. 1913, p. 1616,) it is provided that the Board of Live Stock Commissioners shall appoint three competent veterinary surgeons, who shall constitute a board of veterinary examiners and who shall continue to serve upon such board at the pleasure of the Board of Live Stock Commissioners. It further provides for the filling of any vacancy on the board of examiners by the Board of Live Stock Commissioners. This is a continuing office, clearly created by statute, and comes within the constitutional definition of an office. The appropriation for the compensation of the members of this board cannot, therefore, be made in the Omnibus Bill.

Section 2 of the act to establish and create at the State University a State geological survey, (Hurd's Stat. 1913, p. 2474,) provides that the State Geological Commission shall appoint a director, who may, with the approval of the board, appoint such assistants and employees as may be necessary to carry out the provisions of the act. This creates the office of director of the State geological survey, which office will continue as long as this act remains

in force. The appropriation for the pay of this officer by the Omnibus Bill is invalid.

Appellees complain that the court erred in not holding an appropriation for attorney in the department of the Insurance Superintendent to be invalid, for the reason that he is an officer and the appropriation is contained in the Omnibus Bill. We find no such appropriation in the Omnibus Bill.

Appellees contend that the court erred in not holding the appropriation to the State Board of Health for one attorney and the appropriation for one attorney for the Industrial Board invalid, for the reason that neither of these boards is vested with the power and authority to employ an attorney and thus incur that expense. The statute gives the State Board of Health no power or authority to employ an attorney, but, on the contrary, by section 7 of chapter 126a (Hurd's Stat. 1913, p. 2288,) it is provided that in all prosecutions and proceedings instituted by the State Board of Health it shall be the duty of the State's attorney in each county to prosecute. For the reasons hereinafter given on the question of the right of the Insurance Superintendent to employ counsel to represent him, the appropriation to the Industrial Board for an attorney is invalid. The validity of the appropriations for attorneys for other boards and commissions heretofore mentioned has not been questioned on this ground, the only question raised in reference to them being whether the incumbents of those positions fell within the classification of officers.

Various appropriations contained in the Omnibus Bill are objected to upon the ground that they are unconstitutional, for the reason that they effect an increase of the salary of the various officers for whose departments the appropriations are made. On this ground objection is made to the appropriation to the Governor for the expense of maintaining the mansion, to the Lieutenant-Governor for

traveling expenses, to the Secretary of State for editing
the Blue Book and to the Superintendent of Public In-
struction for conducting examinations, etc.   The section of
the constitution which it is claimed these appropriations
violate is section 23 of article 5, which provides: "The
officers named in this article shall receive for their ser-
vices a salary to be established by law, which shall not be
increased or diminished during their official terms."   In
order to fully understand the exact purpose of the appro-
priations made by the items thus attacked and the means
by which the moneys thus appropriated can be withdrawn
from the State treasury it is necessary to consider some
of the general provisions of the Omnibus Bill, as these en-
ter into and become a part of each item appropriated.

Section 1 of the act provides that "the following named
sums, or so much thereof as may be necessary, respectively,
for the purposes hereinafter named, be, and are hereby,
appropriated to meet the ordinary and contingent expenses
of the State government, until the expiration of the first
fiscal quarter after the adjournment of the next General
Assembly."   Then follow the various items appropriated
by the Omnibus Bill, which are numerous.   By section 2
the method is pointed out whereby the Auditor of Public
Accounts shall draw warrants on the State Treasurer and
the Treasurer shall pay the sums appropriated in the act.
That part of section 2 which provides how the appropria-
tions to the Governor, Lieutenant-Governor, Secretary of
State and Superintendent of Public Instruction, which are
objected to, shall be paid, is as follows: "And for all other
appropriations specified herein warrants on the State Treas-
urer shall, when not otherwise provided by law, be drawn
only on itemized bills, accompanied by receipted vouchers,
showing the expenditure of moneys named in the itemized
bills."

It will thus be seen, as a general proposition, that no
money was intended to be appropriated except so much

as is necessary to meet the ordinary and contingent expenses of the State government, and that such appropriations as are now under discussion cannot be paid out except upon itemized bills, accompanied by receipted vouchers showing the expenditure of the moneys for which demand is made. These portions of sections 1 and 2 of the act must be read in connection with each of the items questioned, and when so read it must appear that it was the intention of the General Assembly to make these appropriations only for such expenses as the officers to whom the appropriations were made are authorized to incur, and to prevent the payment of the money except on a receipted voucher showing that the expenses had actually been incurred and paid. It is apparent that none of these appropriations were intended to be for the personal benefit of the officer to whom the appropriation was made. It is only necessary to determine, therefore, whether the expenses for which the appropriations were made are such as would properly constitute a charge against the State or should be borne personally by the officer to whom the appropriation was made.

The salary of the Governor is fixed by section 1 of chapter 53 of Hurd's Statutes of 1913 as follows: "There shall be allowed and paid an annual salary, in lieu of all other salaries, fees, perquisites, benefit or compensation in any form whatsoever, to each of the officers herein named, the following sums respectively: To the Governor, the sum of $12,000, together with the use and occupancy of the executive mansion." The executive mansion was erected pursuant to an act entitled "An act to appoint commissioners to build a house for the Governor of the State of Illinois," approved February 12, 1853, in force February 12, 1853. (Laws of 1853, p. 220.) Ever since the erection of the mansion the compensation of the Governor has been fixed at a certain sum, together with the use and occupancy of the executive mansion. The act of 1853 provided that

the mansion was to be erected to be occupied by the Governor of the State of Illinois as a residence. The item objected to, and which it is. claimed is, in effect, an increase of the salary of the Governor, is as follows: "To the Governor, for the care of the executive mansion and grounds, and for heating, lighting, expenses of public receptions, wages and sustenance of employees, automobile and stable expense and other incidental expenses of the executive mansion, the sum of $13,000 per annum."

Appellees concede that it is within the power of the General Assembly to place at the disposal of the Governor such a sum as in its judgment is necessary for heating and lighting the executive mansion and for the care of the grounds, but contend that the words, "use and occupancy of the executive mansion," as found in section 1 of chapter 53 of Hurd's Statutes of 1913, do not give the General Assembly the right to make an appropriation for the wages and sustenance of employees, for automobile and stable expense and for other incidental expenses of the executive mansion. As the appropriation for all the purposes enumerated in the item is made in a lump sum, that part which appellees concede is unobjectionable cannot be separated from the part to which objection is made. The people of the State have provided their chief executive with a place of residence, designated as the executive mansion. The Governor is expected, if, indeed, he is not required, to reside therein during his term of office. It must be apparent, as appellees concede, that the provision for the use and occupancy of the executive mansion necessarily includes the heating and lighting and the care of the grounds. It will not be presumed that the Governor would require any employees about the executive mansion or would incur any automobile and stable expense so far as the necessities of himself and his family are concerned. The people of the State have the right to expect and require that their chief executive shall maintain the position among the

citizens of the State which the dignity of his office demands, and if, in order to maintain that position and preserve the dignity of the office, the General Assembly deems it necessary to engage certain employees at the executive mansion, it has as much right to provide for their employment as it has to provide for the pay of employees about any other public building in the State. If it is deemed necessary and in keeping with the dignity of the office of Governor to maintain a stable or garage and to give public receptions and the like on appropriate occasions, it is a proper expense to be borne by the people of the State. As to what is embraced in the term "other incidental expenses," as we view it, there can be no serious question. The appropriation, as has been stated, is for the executive mansion and grounds, heating and lighting, expenses of public receptions, wages and sustenance of employees, automobile and stable expenses, and "other incidental expenses" of the executive mansion, which necessarily means only expenses of the same general character as those already enumerated. These expenses can only be paid upon the presentation of the itemized and receipted vouchers provided for by section 2 of the Omnibus Bill. None of the expenses authorized are in any way personal to the Governor, and it cannot be seriously contended that any of such expenses should be borne by him personally. The appropriation does not, in terms, profess to be one making an increase in the salary of the chief executive. Neither can it be urged that it is a shift, device or subterfuge used to accomplish that purpose. The circuit court properly held this item a valid appropriation.

The appropriation to the Lieutenant-Governor of $2000 per annum for traveling expenses is attacked on the ground that it is an increase in the salary of that officer made during his term of office and therefore unconstitutional. The statute provides that the salary of the Lieutenant-Governor shall be the sum of $2500 per annum. This is intended as

compensation for his personal services. If in the performance of his duties it becomes necessary for him to incur traveling expenses these constitute a proper charge to be paid by the State. The Lieutenant-Governor is the only member of the executive department who is not required to reside at the seat of government, and as his chief duty as Lieutenant-Governor is to preside over the deliberations of the senate when the General Assembly is in session, it is apparent that he will necessarily incur some traveling expenses. The money expended for railroad fare, or for any other means of conveyance required, is the expense he is entitled to have refunded as traveling expenses, and to that extent the appropriation is valid.

By paragraph 7 of section 1 of the Omnibus Bill the appropriation is made for the maintenance of the office of the Secretary of State, and among other items appropriated is the following: "For editing the Blue Book, $2000." By paragraph 27 the appropriation is made for the maintenance of the office of the Superintendent of Public Instruction, and the following among other items are appropriated: "For conducting three county examinations, $1500 each, setting questions and correcting manuscripts, $4500 per annum; for conducting State examination, setting questions and correcting manuscript, $250 per annum; for conducting examinations for medical colleges, $1400 per annum;" and it is contended that these are appropriations for additional salaries to the Secretary of State and the Superintendent of Public Instruction. These items must be read in connection with the general provisions of sections 1 and 2 of the act. When so read it must be apparent that the appropriation was not for the personal benefit of the Secretary of State or the Superintendent of Public Instruction or as pay for services to be rendered by them individually. Had the items read, "for the expense of editing the Blue Book," and "for the expense of conducting three county examinations," etc., we take it that

no objection would have been made, and yet that is the effect and meaning of these items when read in connection with the general provisions of the act, which apply to these as well as all the other items in the act. The contention that an appropriation of $2000 to the Secretary of State, or so much thereof as may be necessary, as one of the ordinary and contingent expenses of the State government for editing the Blue Book, is an appropriation of additional salary to the Secretary of State cannot be successfully maintained, and yet, under the express terms of the act, this is the appropriation made, and the Secretary of State can only avail himself of the money appropriated by complying with the provisions of section 2 in producing an itemized bill, accompanied by receipted vouchers showing the expenditure of the moneys named in the itemized bill. That it was not contemplated or intended that the Secretary of State should personally edit the Blue Book and receive this compensation is too clear to admit of argument; and should he do so, this appropriation would not be available, as he must by his receipted vouchers show that the money secured from this appropriation has been expended by him for this purpose. The same reasoning applies to the objection made to the appropriation for the Superintendent of Public Instruction. It is clear that this is an appropriation to meet the expenses of conducting the various examinations enumerated, and the money can only be paid out when the Superintendent of Public Instruction has shown, by receipted vouchers, that the money has been expended for these purposes. These appropriations were properly held to be valid.

By the seventh paragraph of section 1 of the Omnibus Bill there is appropriated to the Secretary of State, among other appropriations, "for telephone toll for members of the General Assembly, $2500," and it is insisted that this is in violation of section 21 of article 4 of the constitution, which provides: "The members of the General Assembly

shall receive for their services the sum of $5 per day, during the first session held under this constitution, and ten cents for each mile necessarily traveled in going to and returning from the seat of government, to be computed by the Auditor of Public Accounts; and thereafter such compensation as shall be prescribed by law, and no other allowance or emolument, directly or indirectly, for any purpose whatever, except the sum of $50 per session to each member, which shall be in full for postage, stationery, newspapers and all other incidental expenses and perquisites." It will be observed that this section of the constitution is full and explicit as to the compensation, mileage and incidental expenses of the members of the General Assembly. The salary which the members of the General Assembly should receive after the first session held under the constitution of 1870 is left entirely to the judgment and discretion of the General Assembly. If it should find, from the experience of its members, that the salary being paid at any given time is not sufficient to compensate them, it is within the power of the General Assembly to increase the salary of its members in the future. It was the evident intention of the people in adopting the constitution to require all legislation on the question of the compensation to be paid the members of the General Assembly to be clear-cut and unmistakable and to prevent any increase in their compensation under the guise of incidental expenses incurred in transacting the business of the State. If this were not so, the constitution would not have been so explicit in defining the positive limit of the amount allowed for all incidental expenses. The members of the General Assembly are plainly limited to the sum of $50 for all incidental expenses, and this item is clearly in violation of said section 21 and is therefore invalid.

Paragraph 26 of section 1 of the Omnibus Bill is as follows: "To the State Treasurer, such sums as may be necessary to refund the taxes on real estate sold or paid

on error and for over-payment of collectors' accounts under. laws governing such cases, to be paid out of proper funds." The objection to this item is that no definite sum is appropriated. Paragraph 3 of section 16 of article 5 of the constitution is, in part, as follows: "Bills making appropriations of money out of the treasury shall specify the objects and purposes for which the same are made, and appropriate to them respectively their several amounts in distinct items and sections." It will thus be seen that to make a valid appropriation a definite sum of· money must be appropriated for the purpose specified. By section 18 of article 4 the constitution also provides that the aggregate amount of the appropriations necessary for the ordinary and contingent expenses of the government until the expiration of the first fiscal quarter after the adjournment of the next regular· session of the General Assembly shall not exceed the amount of revenue authorized by law to be raised in such time. If .appropriations were to be made in this manner it would be impossible to determine the aggregate amount appropriated, and it would .never be known whether or not such amount exceeded the total amount of revenue permitted to be raised. This item is invalid.

In paragraph 46 of section 1 of the Omnibus Bill the following appropriations are made to the Insurance Superintendent: "For legal services, $4000 per annum; for expenses of prosecutions of violations of the insurance laws, $15,000 per annum; * * * for traveling expenses of attorneys, court costs *in re* prosecutions of violations. of the insurance laws, $2000 per annum." In paragraph 63 of · said section 1 an appropriation is made to the Rivers and Lakes Commission, as follows: "For prosecutions, $2500 per annum." And in paragraph 74 of said section the following appropriation is made to the State Board of Pharmacy: "For investigating and prosecuting illegal sale of narcotic drugs, $3000 per annum." It was the contention

of the appellees in the court below, and is their contention here, that these appropriations are each of them invalid, for the reason that they make provision for the compensation for the performance of duties on the part of the Insurance Superintendent, the Rivers and Lakes Commission and the State Board of Pharmacy which devolve upon and should be performed by the Attorney General as the chief law officer of the State. Appellants, represented by the Attorney General, made the same contention as appellees in the court below in reference to the Insurance Superintendent and make the same contention here. They contended in the court below, however, and their contention here is, that the appropriations to the Rivers and Lakes Commission and the State Board of Pharmacy are valid. The contention of the Insurance Superintendent is that the appropriation to the Insurance Superintendent is valid. He was permitted to appear and present his views in the court below and has been permitted to file a separate brief in his own behalf in this court.

The Insurance Superintendent bases his contention that the appropriation is for a valid purpose and that he has been given the power to represent the State and enforce the laws in relation to insurance upon the statutes. In the view we have taken it will not be necessary to enter into an extended discussion of the law of the State in reference to the subject of insurance. Prior to 1869 insurance corporations were treated in this State in the same class as corporations in general. In that year somewhat comprehensive legislation was enacted on the subject of insurance, by which, together with subsequent laws on that subject, the supervision of insurance was vested in part in the Auditor of Public Accounts and in part in the Attorney General. (Laws of 1869, pp. 209-229.) In 1893 a separate insurance department was established and the office of Insurance Superintendent was created. (Laws of 1893, p. 107.) By this act the powers of the Auditor were

expressly transferred to the Insurance Superintendent, but the powers and duties of the Attorney General, as they had been theretofore specified, were not changed. In 1899 the act of 1893 was amended by an act which purported to relieve the Attorney General of all the powers and duties imposed upon him by statute in relation to insurance and to confer the same upon the Insurance Superintendent. (Laws of 1899, p. 256.) There is no question but by the amended act of 1899 the General Assembly intended, and attempted, to confer upon the Insurance Superintendent power to do all things in reference to insurance which had theretofore been required to be done by the Attorney General. If the General Assembly had the power to strip the Attorney General of all these powers and duties and to authorize the Insurance Superintendent to represent the State in matters of litigation to the exclusion of the Attorney General, then the contention of the Insurance Superintendent must be upheld and the appropriations for his department which are objected to held to be valid.

The office of Attorney General is created by section 1 of article 5 of the constitution of 1870, which is as follows: "The executive department shall consist of a Governor, Lieutenant-Governor, Secretary of State, Auditor of Public Accounts, Treasurer, Superintendent of Public Instruction and Attorney General, who shall, each, with the exception of the Treasurer, hold his office for the term of four years from the second Monday of January next after his election, and until his successor is elected and qualified. They shall, except the Lieutenant-Governor, reside at the seat of government during their term of office, and keep the public records, books and papers there, and shall perform such duties as may be prescribed by law." It will be observed that the constitution confers no express powers upon the Attorney General and prescribes no express duties for him to perform. It simply provides that he shall perform such duties as may be prescribed by law. The office

of Attorney General was one known to the common law,
and under the common law the Attorney General had well
known and well defined powers and it was incumbent upon
him to perform well known and clearly prescribed duties..
It is not necessary, and indeed it would be difficult, to enu-
merate all the powers vested in the Attorney General at
common law and all the duties which were imposed upon
him to perform.   It is sufficient for the purposes of the dis-
cussion of the point here involved to state that at common
law the Attorney General was the law officer of the crown
and its chief representative in the courts.   (*Rex* v. *Austen,*
9 Price, 12; *Attorney General* v. *Brown,* 1 Swanst. 294;
*Rex* v. *Wilkes,* 4 Burr. 2570; *Wilkes* v. *Rex,* 4 Brown's
P. C. 360; 1 Tomlin's Law Dict. 129; 25 Law Quarterly
Rev. 400.)   We have had our attention called to but one
case which disagrees with this proposition, and that is the
case of *Wilkes* v. *The King,* as reported in Wilmot's Notes
of Opinions, 322.   This is the same case as *Wilkes* v. *Rex,
supra,* (4 Brown's P. C.) and purports to be compiled from
the notes of Lord Wilmot, who delivered the reasons for
the judgment entered by the House of Lords.   By this re-
port of the case the court took the view that the Attorney
General was not the chief representative of the crown in
the courts but that the king might designate anyone he chose
to represent the crown.   This report of the case is in con-
flict with that in 4 Brown's P. C. *supra.*   The irreconcilable
variance between these two reports is probably accounted
for by the manner in which Wilmot's Notes of Opinions
was compiled and printed.   Lord Wilmot died in 1792.
The Notes of Opinions was published in 1802 from manu-
scripts found among his effects.   The work contains a pref-
ace, (or "Advertisement," as it is named,) which states the
circumstances under which the notes were published, and
referring to these manuscripts or notes says: "They were
certainly not intended by the learned judge for publication,
and some of them are not perfect.   There is no doubt but

they would have been all equally valuable if they had all received his last correction, and still more if his modesty had permitted him to revise them with a view to publication. As it is, the profession and the public will make allowance for the disadvantages under which they are presented to them." As this report of the *Wilkes case* is not only out of harmony with the other report of the same case but also with other reputable authority on this question, and in a sense is discredited by the publisher in the preface to the work containing it, we do not regard it as authority, but recognize as correct the proposition supported by the authorities just cited. Under our form of government all of the prerogatives which pertain to the crown in England under the common law are here vested in the people, and if the Attorney General is vested by the constitution with all the common law powers of that officer and it devolves upon him to perform all the common law duties which were imposed upon that officer, then he becomes the law officer of the people, as represented in the State government, and its only legal representative in the courts, unless by the constitution itself or by some constitutional statute he has been divested of some of these powers and duties.

The constitution provides, as has been noted, that the Attorney General shall perform such duties as may be prescribed by law. The common law is as much a part of the law of this State, where it has not been expressly abrogated by statute, as the statutes and is included within the meaning of this phrase. The question presented for our determination is, whether by creating this office under its well known common law designation the constitution engrafted upon it all the powers and duties of the Attorney General as known at common law, and gave the General Assembly authority to confer and impose upon the Attorney General only such additional powers and duties as it should see fit.

In *Dahnke* v. *People,* 168 Ill. 102, we had occasion to inquire into the constitutional powers and duties of a sheriff.

270 — 22

The office of sheriff is created by section 8 of article 9 of the constitution of 1870 without in any way defining the powers and duties of the office. A sheriff was an officer known to the common law, and in passing upon the question whether, by creating this office, the constitution engrafted upon it all the common law powers and duties of a sheriff and thus permitted the legislature to confer upon him only new and additional powers, we said: "The constitution of this State provides for the election of sheriffs. (Art. 10, sec. 8.) Sheriffs, as elected under the constitution, have the same powers with which they were clothed at common law. Murfree, in his work on Sheriffs, (sec. 42, chap. 2,) says: 'The very name and office of sheriff imply the possession by that functionary of all the powers and the obligation to perform all the duties of a common law sheriff, except so far as those powers and duties may have been modified by State constitutions or constitutional statutes.' The same author also says: 'When the office of sheriff is a constitutional office in any State, recognized and designated *eo nomine* by the constitution as a part of the machinery of the State government, the sheriff, *ex vi termini*, must possess in that State all the substantial powers appertaining to the office by common law. It is competent for the State legislature to impose upon him new duties growing out of public policy or convenience, but it cannot strip him of his time-honored and common law functions and devolve them upon incumbents of other offices created by legislative authority.' (Ibid. sec. 41.) It has accordingly been held that the legislature cannot transfer to other officers elected by the board of supervisors the power of the sheriff to have the custody and control of the jail and the prisoners therein when the constitution provides for the election of sheriffs without designating what their powers shall be.—*State* v. *Brunst,* 26 Wis. 412; *People* v. *Keeler,* 29 Hun, 175." That case is analogous to the one now under consideration. It differs from the case at bar only in.

this particular: The constitution, in creating the office of Attorney General, provided that he should perform such duties as may be prescribed by law, whereas there is no provision whatever in the constitution as to what duty shall be performed by the sheriff. We have taken the same view, however, in reference to the common law powers and duties of the Attorney General as we have taken in the *Dahnke case* in reference to those of a sheriff.

In *People* v. *McCullough,* 254 Ill. 9, we had occasion to discuss this question, and we there said: "The supreme executive power is lodged, by section 6 of article 5, in the Governor, who is the head of the executive department under the present constitution no less than under preceding constitutions. The other executive officers named are entirely subject to the control of the legislature in the conduct of their offices, except where the constitution, expressly or by implication, imposes certain duties or confers certain powers, or where the name of the office itself implies the possession of certain powers. The Attorney General is vested with many powers and duties, and these appertain to his office under the constitution. He cannot be deprived of these common law functions by the legislature, but new duties may be imposed."

In *Chicago Mutual Life Indemnity Ass'n* v. *Hunt,* 127 Ill. 257, the insurance laws as they existed prior to the establishment of a separate insurance department by the act of 1893 were involved. By the act there under consideration it was provided that when any insurance company organized under the provisions of that act should neglect or refuse to make its annual statement as required, or whenever the Auditor should find, upon examination, that a willfully false or untrue statement had been made, or that the business of the company had been conducted fraudulently or in willful violation of the law, or that the company had transacted business different from that authorized by its certificate of incorporation, he should communicate the fact

to the Attorney General, whose duty it should be to apply to the circuit court for an order requiring the officers of the company to show cause why they should not be removed from office or its business closed. It was there contended that the Attorney General was without authority to institute the proceeding because, as alleged, no sufficient report had been made to him by the Auditor. In passing upon that question we said: "We are of the opinion that the power of the Attorney General to file the information in no way depended upon the communication made to him by the Auditor but came within the purview of those powers which are inherent in his office. (See *Hunt* v. *Chicago Horse and Dummy Railway Co.* 20 Ill. App. 282; *Same case,* 121 Ill. 638.) The section of the statute under consideration conferred no new *powers* upon him but vested the Auditor with the supervision of associations organized under the statute, and made it the *duty* of the Attorney General to take proper legal proceedings whenever the Auditor should communicate to him the fact that an association or its officers had so conducted as to give occasion for the removal of the officers from their offices or the closing of the business of the association." We there held that there were certain powers which were inherent in the office of Attorney General. These could be only such powers as the Attorney General possessed at common law and which attached to that office when it was created in the manner it was by our constitution.

It is insisted on the part of the Insurance Superintendent that what was said in *Dahnke* v. *People, supra,* in reference to the common law powers of a sheriff, and what was said in *People* v. *McCullough, supra,* in reference to the common law powers of the Attorney General, was *obiter dictum* and not necessary to a decision of the questions involved. What was there said was a correct statement of the law and a correct definition of the powers and duties of those officers.

The Insurance Superintendent relies upon *North American Ins. Co.* v. *Yates*, 214 Ill. 272. In that case we said: "By the act of 1893, creating the department of insurance, it is provided: 'The Insurance Superintendent shall possess and have all the powers, and he may perform all the duties in regard to the business of insurance in this State, which are now attached by law to the office of Auditor of Public Accounts and the Attorney General.' (Hurd's Stat. 1903, chap. 73, par. 3.) It follows, then, that any suit or proceeding that could before, or can now, without that provision be instituted and prosecuted by the Attorney General can be maintained by the Superintendent of Insurance." By the various acts of the legislature prior to the act of 1893 the control of insurance matters was vested in the Auditor and the Attorney General. Some of the powers attempted to be conferred and some of the duties attempted to be imposed upon the Attorney General by those acts were powers and duties which were already conferred and imposed upon him by the constitution, as they were inherent in his office. Such other powers and duties as were by those acts conferred and imposed upon him were added powers and duties for which the legislature had the authority to provide. When by the act of 1893 the General Assembly attempted to strip the Attorney General of all his powers and duties in reference to insurance matters, it was effective only to the extent of such added powers and duties as had been conferred and imposed by the legislature and did not affect those which were inherent in his office. As was held in the *Yates case,* the Insurance Superintendent now has the right to institute prosecutions and maintain any suit or proceeding that could theretofore have been prosecuted in the name of the Attorney General. It does not follow, however, that he may employ other counsel than the Attorney General or secure other legal advice than his in the prosecution of such proceedings. Such proceedings may be prosecuted in the name

of the Insurance Superintendent, but he must look to and depend upon the Attorney General for all legal services.

Our attention is called to the case of *Field* v. *People,* 2 Scam. 79, where, in considering the powers of the Governor, we held that officer possessed no powers except those expressly granted by the constitution. The reasoning in that case can have no application here, because the Governor, being an officer unknown to the common law, has no common law powers, while the Attorney General, as hereinbefore pointed out, possesses well defined common law powers which are inherent in the office.

It is true there were other representatives of the crown in the courts at common law, but they were all subordinate to the Attorney General. By our constitution we created this office by the common law designation of Attorney General and thus impressed it with all its common law powers and duties. As the office of Attorney General is the only office at common law which is thus created by our constitution the Attorney General is the chief law officer of the State, and the only officer empowered to represent the people in any suit or proceeding in which the State is the real party in interest, except where the constitution or a constitutional statute may provide otherwise. With this exception, only, he is the sole official adviser of the executive officers and of all boards, commissions and departments of the State government, and it is his duty to conduct the law business of the State, both in and out of the courts. The appropriation to the Insurance Superintendent for legal services and for traveling expenses of attorneys and court costs in prosecutions for violations of insurance laws is unconstitutional and void. The appropriation of $15,000 for expenses of prosecutions of violations of the insurance laws is not one necessarily for the purpose of paying the salaries or fees of attorneys for legal services in the prosecution of any suit or proceeding, but may be for the purpose of conducting investigations in connection with the prose-

cutions of violations of the insurance laws and meeting various items of expense that might properly be incurred on the part of the Insurance Superintendent in preparing to institute prosecutions. The use of any part of this sum for the purpose of employing attorneys to perform legal services would not be proper, and the Auditor should refuse to issue a warrant, and the State Treasurer to pay the same, for any such purpose. It does not appear from the language used in this item of appropriation that such is the purpose. It could only be inferred from the size of the appropriation that it was in the contemplation of the legislature that a part of it should be used for such purpose. We have nothing to do, however, with the amount of an item of appropriation. As to what the amount should be is a question that rests entirely in the discretion of the legislature. This item of $15,000 for expenses of prosecutions of violations of the insurance laws is made for a proper purpose and is valid. The same reasoning applies to the appropriation of $2500 to the Rivers and Lakes Commission for prosecutions and $3000 per annum to the State Board of Pharmacy for investigation and prosecution of the illegal sale of narcotic drugs. These appropriations would each of them be invalid if they were made for the purpose of employing attorneys to prosecute violations of such laws, but they are not so expressly made, and, so far as the language employed in expressing the purpose for which the appropriations are made is concerned, the purpose is a proper one and the appropriations are valid.

Appellees contend that joint resolutions of the General Assembly appointing joint committees of the two houses for the performance of duties after the *sine die* adjournment of the legislature, and the making of appropriations to provide for the necessary expenses of such joint committees, are illegal and void. It is impossible to ascertain from the allegations in the amended bill and the assignment of cross-errors just what resolutions and what appropria-

tions are objected to, because of inaccuracies contained in both the bill and the assignment of cross-errors. This is immaterial, however, as there can be no question as to the identity of three of the items questioned, and the holding as to them will govern as to all joint resolutions passed and all appropriations made in the same manner.

Appellees' contention that appropriations made for the expenses of committees appointed to sit after the final adjournment of the legislature are invalid, is based on three grounds, two of which, only, will be considered, viz.: (1) The constitution forbids the withdrawal of funds from the State treasury by separate or joint resolution; and (2) all agencies of the legislature cease upon *sine die* adjournment.

The first reason urged is not tenable, as the appropriations are made for the expenses of such committees by law and not by resolution. It is not contended that the Omnibus Bill was not regularly passed, and these appropriations appear among the items of that bill. The Omnibus Bill does not pretend, however, to create or appoint these committees, but merely makes appropriations for the expenses of the committees created by the various joint resolutions.

With the *sine die* adjournment of the legislature all its functions as a legislative body cease. Its work is ended. It will not again be called into existence except on the call of the chief executive for a special purpose, and no presumption will be indulged that it will be again so called into being. During the sessions of the legislature either house may appoint separate committees, and the two houses, acting concurrently, may appoint joint committees for any proper purpose, which may exercise such powers as the house or houses appointing them may lawfully delegate or impose. The only powers which can be conferred upon and delegated to such committees are such powers as are possessed by the house or houses making the appointment. As all the powers of the legislature, as such, cease upon its final adjournment, it must follow that all the powers which

have been delegated by it, or either house thereof, to a committee by mere resolution cease also. In *Tipton* v. *Parker*, 71 Ark. 193, it was held that neither house of the General Assembly, by separate resolution, has the authority to appoint a committee to make any investigation after the final adjournment of the legislature. We perceive no reason why the holding in that case, of which we approve, should not apply to a joint resolution of both houses appointing such committee. Such committees may be appointed, and they may act and may lay before the succeeding General Assembly the result of their investigations, but in so doing they are acting under no authority but by mere request, and they have no authority delegated to them which they may exercise. In such a case the act is not that of a committee authorized by the legislature or either house thereof, but is the voluntary act of mere private individuals. The legislature has no power to make an appropriation to pay the expenses of such persons who may thus voluntarily perform services, even though the same may be performed at the request of the legislature. The expenses so incurred are the private and individual debts and liabilities of such persons. Section 20 of article 4 of our constitution provides: "The State shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to or in aid of any public or other corporation, association or individual."

In support of their contention that these appropriations are valid, appellants cite and rely upon *State* v. *Frear*, 138 Wis. 173, *Branham* v. *Lange*, 16 Ind. 497, and *In re Davis*, 58 Kan. 368. In the *Frear case* the Wisconsin court neither in the statement of the case nor in the opinion announcing its decision states whether the joint committee there appointed under a concurrent resolution was appointed for the purpose of making an investigation during the session of the legislature or after its final adjournment. In the *Lange case* the committee was appointed by an act regularly passed

and not by a joint or concurrent resolution. In the *Davis case* the Kansas court does hold that the legislature has the power to confer authority on a committee to continue its labors after final adjournment. With this conclusion we do not agree. In that case, however, there was no question involved of the right of the legislature to make an appropriation to pay the expenses incurred by such a committee.

We are not unmindful of the fact that for many years it has been the practice of the legislature of this State, and of each house thereof, to thus appoint, by joint or separate resolutions, committees to act after the session of the legislature had ended, but we have never been called upon to determine the validity of such action. The long indulgence in this custom cannot create a right in the legislature, or either house thereof, to do that which it has no power or authority to do. The legislature has the undoubted right to create a commission for any proper purpose by an act regularly passed as required by the constitution, which may be vested with such powers and required to perform such duties as the act creating it may provide, and such commission may be empowered to exercise its powers and perform its duties both during the time the legislature may be in session and after its final adjournment. This is the only means by which the legislature can accomplish the purposes and attain the ends sought to be accomplished and attained by means of the joint resolutions pursuant to which the appropriations here objected to were made. These appropriations are invalid.

The amended bill charges that the Governor disapproved various items in the Omnibus Bill and modified and amended said items, and thereby rendered said items so modified and changed unconstitutional, illegal and void. The Governor's veto message is attached as an exhibit to the bill, in and by which it appears the Governor attempted to reduce some of the appropriations in the Omnibus Bill, in some instances by striking out the words "per annum"

appearing after the item, and in others by approving only a portion of the amount appropriated by the legislature for a particular purpose and purporting to veto the excess only of such appropriations. His action in these two particulars can be best shown by quoting the two following paragraphs from the veto message:

"In section 1, paragraph eleventh, line 32, item 'per annum,' I disapprove of the words 'per annum' after the figures $2500, leaving the item to read, 'for publication of decisions of the court of claims, the sum of $2500.'"

"In section 1, paragraph eleventh, line 32, item '$4500 per annum,' I approve in the sum of $3500 per annum and veto and withhold my approval of all of the sum in said item in excess of said sum of $3500 per annum."

The paragraphs quoted illustrate the action taken by the Governor in reference to each of the other items mentioned in the veto message and objected to by the amended bill. It is further alleged that the Omnibus Bill was returned by the Governor to the house of representatives together with his said message, and that no action was taken by the house with reference to a reconsideration of the bill. Appellees contended in the court below, and contend here, that where the Governor disapproved of a part of an item in either of the methods stated he vetoed the whole item. It is the contention of appellants that the act of the Governor in attempting to veto a part of an item by either of the methods stated was void and did not have the effect of vetoing either a part or the whole of the item, but left the item intact and in full force and effect as it was passed by the legislature. As the Attorney General, representing appellants, did not agree with the position taken by the Governor on this question, the Governor has been permitted to file a special brief on this question through the Attorney General stating his position, which is that he had the power to veto a portion of an item by either of the methods stated.

Section 16 of article 5 of the constitution is, in part, as follows: "Bills making appropriations of money out of the treasury shall specify the objects and purposes for which the same are made, and appropriate to them respectively their several amounts in distinct.items and sections, and if the Governor shall not approve any one or more of the items or sections contained in any bill, but shall approve the residue thereof, it shall become a law as to the residue in like manner as if he had signed it. The Governor shall then return the bill, with his objections to the items or sections of the same not approved by him, to the house in which the bill shall have originated, which house shall enter the objections at large upon its journal, and proceed to reconsider so much of said bill as is not approved by the Governor."

The question here presented has never been passed upon in this State. We think it is clear that the power given the Governor by the constitution to disapprove of and veto any distinct item or section in an appropriation bill does not give him the power to disapprove of a part of a distinct item and approve the remainder. To permit such a practice would be a clear encroachment by the executive upon the rights of the legislative department of the State. By the constitution the powers of the government of this State are divided into three distinct departments,—legislative, executive and judicial,—and no person or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as in the constitution expressly directed and permitted. The legislative branch of the government is vested with the discretion to determine the amount which should be appropriated for any particular object. The Governor, as the chief executive of the State, is given the right to approve or disapprove of the action of the legislature in making such an appropriation. He may disapprove of it for the reason that in his judgment no appropriation should be made for such a

purpose, or for the reason that the amount appropriated is too large, or for any other reason satisfactory to him, but he has not the right to disapprove of a certain portion of an item appropriated and approve of the remainder, and thus perform a function which belongs exclusively to the legislative branch,—that of using the discretion necessary to determine the amount which should be appropriated for any particular object. It is no answer to this proposition to say that under the constitution the Governor must return the bill to the assembly with his objections, and the assembly will then have an opportunity to pass the bill notwithstanding the disapproval of the Governor, provided two-thirds of the members of each house vote to do so. The constitution contemplates that the Governor shall approve or disapprove of an item *in toto,* and that the legislature may then determine whether it shall adhere to its action or yield to the views of the Governor and either abandon such appropriation entirely or enact new legislation on that subject. Under the contention of the Governor the legislature is given a choice, upon receipt of the veto message, not contemplated by the constitution,—that of passing the item partially disapproved over the veto of the Governor or of accepting an appropriation it had not made and had not intended should be made. This would result in an invasion by the Governor of the functions of the legislative department. (*State* v. *Holder,* 76 Miss. 158.) While it is true that in one sense the Governor, when engaged in considering bills, is acting in a legislative capacity, and is for that purpose a part of the legislative department of the State, (*Fowler* v. *Peirce,* 2 Cal. 172; *Lukens* v. *Nye,* 156 id. 498; *People* v. *Bowen,* 21 N. Y. 521;) he is exercising only a qualified and destructive legislative function and not a creative legislative power. (*State* v. *Holder, supra.*) The Governor, as one of the executive department, is forbidden to exercise any legislative function except that expressly provided by the constitution. Under the provisions of the

constitution he can never exercise a creative legislative power. The contrary view is taken in Pennsylvania, where it is held in *Commonwealth* v. *Barnett,* 199 Pa. 161, that the Governor may disapprove a part of an item appropriated, but the holding is based upon a provision of the constitution of Pennsylvania which is construed to use the words "item" and "part" interchangeably and in the same sense. As will be noted, our constitution permits of no such construction, as the words "item" and "sections" alone are used as signifying the portions of an appropriation bill which may be approved or disapproved. We do not perceive any difference in principle between the two methods adopted by the Governor in vetoing portions of the items contained in the Omnibus Bill. The veto of the words "per annum" after the figures expressing the amount appropriated yearly is the same, in effect, as a disapproval of one-half of the amount named in the items. It is the veto of a part of an item. The constitution gives the Governor no power or authority to exercise the right of veto in this manner. The question then remains whether his action in thus disapproving a part of an item had the effect of disapproving the whole item, or whether it was nugatory and wholly ineffectual and left the item as though no action whatever, had been attempted on his part. In his veto message the Governor said: "I return herewith House Bill No. 975, 'An act to provide for the ordinary and contingent expenses of the State government until the expiration of the fiscal quarter after the adjournment of the next regular session of the General Assembly,' and veto and withhold my approval from the following items and amounts therein contained," following which he expressed his disapproval of portions of various items in the manner above set forth. The Governor is authorized to express his disapproval of any item or section contained in any appropriation bill only in the manner provided by the constitution. He must either approve or disapprove of the item as a whole. In this in-

stance he did not express his disapproval of any item as a whole. He merely expressed his disapproval of a portion of each of the various items, but approved of the remainder of such items.

In *State* v. *Holder, supra,* the Governor of Mississippi attempted to modify the provisions of a bill under which an appropriation would become available. Section 73 of the constitution of Mississippi is as follows: "The Governor may veto parts of any appropriation bill and approve parts of the same, and the portions approved shall be law." In discussing the right of the Governor to do this under the constitution of that State, the Mississippi court said: "The true meaning of section 73 is that an appropriation bill made up of several parts,—that is, distinct appropriations, different, separable, each complete without the others, which may be taken from the bill without affecting the others, which may be separated into different parts complete in themselves,—may be approved and become law in accordance with the legislative will, while others of like character may be disapproved and put before the legislature again, disassociated from the other appropriations. To allow a single bill, entire, inseparable, relating to one thing, containing several provisions, all complementary of each other and constituting one whole, to be picked to pieces and some of the pieces approved and others vetoed, is to divide the indivisible, to make one of several, to distort and pervert legislative action, and by veto make a two-thirds vote necessary to preserve what a majority passed allowable as to the entire bill but inapplicable to a unit composed of divers complementary parts, the whole passed because of each. The bill in question is an entire thing, inseparable in its provisions and to be approved or disapproved as such, and not having been signed as a whole was not made law by the partial and qualified approval which it received. It cannot be law, for that would be to make law of what has not been concurred in by the legis-

lature and the Governor.  *  *  *  The. action of the Governor having been unconstitutional, and therefore void, his action in dealing with the bill was a nullity."

This reasoning is correct as applied to the provisions of our constitution.  The action of the Governor in attempting to veto portions of the various items indicated in the veto message was void and without any effect whatever.  Those items remained valid enactments just as though the Governor had expressly approved of them or had allowed them to become a law without his approval.

The decree of the circuit court is reversed and the cause is remanded, with directions to enter a decree in conformity with the views herein expressed.

*Reversed and remanded, with directions.*

Mr. CHIEF JUSTICE FARMER, dissenting:

I am not in accord with the court that no other construction can be placed on section 16 of article 4 of the constitution than that bills making appropriations for the pay of members and officers of the General Assembly and for salaries of the officers of the State government shall contain no provision on any other subject than appropriations for the pay of such members and officers of the General Assembly and officers of the State government.  While I concede the constitutional provision is susceptible of that construction it is not incapable of any other construction. In view of the duty imposed upon the legislature to determine, at the peril of the validity of an appropriation, just who are officers and who are employees, it seems to me a more liberal construction of the constitution would be justified.  Without doing violence to the language used, I think the constitution might be construed to mean that bills making appropriations for the purposes specified shall contain no provision on any other subject than appropriations. If the constitution had so provided in explicit terms the object and purpose of it would have been as fully accomplished

and the public as fully protected as by giving it the construction given by the court. To my mind the purpose of the constitutional provision was to prohibit including in appropriation bills for the payment of officers mentioned, other subjects than appropriations. The precise point here involved has not heretofore been before this court, but in *People* v. *Joyce,* 246 Ill. 124, the constitutional provision was discussed, and it was said: "The manifest object of this provision is to separate legislation from appropriation, in order that no officer's salary shall depend upon legislation and no legislation upon the salary of any officer." In my opinion that construction will preserve to the public all the benefits intended and all that will result from the construction given by the court in the opinion in this case, and it will avoid the General Assembly being required to determine just who are officers and who are employees. Under the decision in this case, if the legislature by mistake includes in a bill making appropriations for the pay of officers an appropriation for the pay of an employee, or *vice versa,* the appropriation will be invalid. This is imposing upon the legislature a duty the performance of which must be of great difficulty, for, notwithstanding the constitutional definition of an officer and an employee, it is by no means always easy to distinguish between them. This case presents a good illustration of that difficulty, for this court and the trial court do not entirely agree upon who are officers and who are employees. If in the determination of that question courts disagree, it will be readily seen the legislature will have difficulty in determining it with accuracy. That courts have not always found the determination of this question free from difficulty will be found by reference to *Bunn* v. *People,* 45 Ill. 397, *People* v. *Loeffler,* 175 id. 585, and 29 Cyc. 1364-1366, and notes. The appropriations held invalid because made for the payment of officers and included in the Omnibus Bill are not attacked because the persons to whom they were made were

270 — 23

not lawfully entitled to the money or because they were illegal for any other reason than that they were for the payment of officers and were included in a bill making appropriations for others not officers. The bill contains no other subject than appropriations. If, as it appears to me, the constitutional provision referred to will bear the construction I have contended for, it seems clear the public good would be as well or better served by so construing it than by construing it as has been done in the opinion in this case.

Mr. JUSTICE CRAIG, dissenting:

The appropriations attacked in this suit as having been made for unlawful purposes have been held valid with the exception of the appropriations to the State Treasurer for refund of taxes, the appropriation to the Secretary of State for telephone tolls for members of the General Assembly, and the appropriation for legal services and traveling expenses of attorneys and court costs for the insurance department. I do not concur with the foregoing opinion as to the last two appropriations; and as to the relief sought by the bill filed in this case, it is not, in my opinion, of such character as would authorize a court of equity to entertain this suit without the intervention of the Attorney General.

The appropriation for telephone tolls is not for the benefit of the General Assembly that made the appropriation or for the members thereof, but is to the Secretary of State as custodian of the capitol building and is for the benefit of the succeeding General Assembly. It is in no way an allowance or emolument or perquisite to any member nor is it an incidental expense to be paid to the members. It is customary in all legislative bodies to provide pages, messengers, stenographers, etc., to perform services for the members. While in one sense this is an additional expense which is incurred for the benefit of each individual member, the members are not supposed to pay these em-

ployees out of their own pockets, and such items of expense
are not considered as incidental expenses personal to the
members but as an incidental expense of holding a session
of a legislative body. I think that the appropriation in
question can properly be classed as one of the incidental ex-
penses of that body as a whole which is necessary to enable
it to more expeditiously discharge its business as a body.
Adequate telephone service is as essential to the proper dis-
charge of the duties of the members of the General As-
sembly as it is for the proper discharge of the duties of
the officers and employees of the other departments of the
State government. The Omnibus Bill includes numerous
items of appropriation for the various State offices, none of
which are challenged in this suit, for telephones, telegraph
and express charges, etc., which will necessarily be incurred
in the proper discharge of the business of those offices,
and in my judgment the appropriation in question for the
members of the succeeding General Assembly is of the same
character and should be sustained as such.

As to the appropriation for legal services, etc., for the
insurance department, it is true that the office of Attor-
ney General was known to the common law. Just what his
duties and prerogatives were, as a matter of judicial his-
tory, is involved in some doubt, to say the least, as may be
gathered from the reports of the common law courts cited
in the majority opinion, particularly the opinion in the case
of *Wilkes* v. *Rex*, on appeal from the court of King's Bench
to the House of Lords, as reported in Wilmot's Notes of
Opinions, on page 322, in which it is said: "The great
abilities of the persons appointed to the office have made it
figure high in the imagination and annexed ideas to it which
do not belong to it, for he is but an attorney, though to the
king, and in no other or different relation to him than every
other attorney is to his employer." The same case as re-
ported in Brown's Cases in Parliament (vol. 4, p. 360,)
holds that the Solicitor General might file an information

as well as the Attorney General, and such had been the common practice. About all that can be said is that he was an attorney for the crown, but, as stated in the majority opinion, he was not the sole representative of the crown in the common law courts.

The extent to which the common law is made a part of our system of laws is fixed by the single section of chapter 28 of the Revised Statutes. As stated by Judge Cooley in his work on Constitutional Limitations (7th ed. p. 94): "It is also a very reasonable rule that a State constitution shall be understood and construed in the light and by the assistance of the common law and with the fact in view that its rules are still left in force. By this we do not mean that the common law is to control the constitution, or that the latter is to be warped and perverted in its meaning in order that no inroads, or as few as possible, may be made in the system of common law rules, but only that for its definitions we are to draw from that great fountain, and that in judging what it means we are to keep in mind that it is not the beginning of law for the State, but that it assumes the existence of a well understood system, which is still to remain in force and be administered but under such limitations and restrictions as that instrument imposes." While it is proper to refer to the common law for assistance in construing a constitution, it does not follow simply because an officer was known to the common law and is also named in the constitution by the same name or common law designation, that there is thereby engrafted into the constitution, as a part thereof, all of the powers, duties and prerogatives of such officer at common law, to the extent that such powers, duties and prerogatives would become constitutional provisions and that the legislative department of the government would have no power to abolish, modify or restrict such common law powers. That would make the common law control the constitution. The constitution of 1818 did not create the office of Attorney General. By paragraph 10

of the schedule it was left optional with the legislature to appoint an Attorney General and prescribe his duties. The constitution of 1848 did not provide for the election or appointment of an Attorney General. Between 1848 and 1867 the State had no Attorney General, so that from 1818 to 1870 every Attorney General of this State was an officer provided for by the statute and whose duties were regulated and prescribed by legislative enactment. It is reasonable to suppose that in adopting the constitution of 1870 the people had in mind by the term "Attorney General" the officer that was known to the law of the State before that time and not the officer existing in England centuries before that time, whose duties and powers could only be ascertained by an examination of the early English Reports, if at all. In the case of *Dahnke* v. *People*, 168 Ill. 102, as to the powers of the sheriff, a reading of the opinion will disclose that the court based its opinion upon the exact question at issue, more upon the powers of the sheriff as conferred upon him by statute than upon his common law powers and prerogatives. In the case of *Chicago Mutual Life Indemnity Ass'n* v. *Hunt*, 127 Ill. 257, it was merely held that in that particular case the Attorney General had power to act. The question was not involved as to whether, in a proper case, other officers or attorneys could by law be empowered to also act in similar suits.

To hold that it is the duty of the Attorney General to conduct the entire law business of the State, and that he is the sole official adviser of all boards,. commissions and departments of the State government, in my opinion is unwarranted, and such holding is not supported by the common law authorities, is contrary to the constitution and the statutes which fix the duties of that office, and is opposed both to the letter and spirit of our laws. There would be just as much reason for saying that such officers as justices of the peace, constables and coroners, which were all known to the common law and had duties, powers and prerogatives

which they do not have in this State, and who are also mentioned in the constitution, have all the powers, duties and prerogatives of the officers of the same name at common law, and that the enactments of the General Assembly fixing the duties of these officers which in any way deprive them of their common law powers and prerogatives are all invalid. If the Attorney General of this State were appointed by the Governor and held office at his pleasure, as the Attorney General of England was appointed by the crown and held office and as the Attorney General of the United States is appointed by the President and holds office, there would be more reason for holding that he is the chief adviser of State officers and the different State boards and commissions. Under our system the different boards and commissions appointed by the Governor, as head of the executive department of the State, have to deal with so many questions of law and procedure which directly affect the objects and purposes for which they were created, that when all these matters are put under the control of an officer who is not responsible to the executive who appoints these boards and who controls and directs their policies, it cannot help but create confusion and substitute the Attorney General as the directing head of all such boards and commissions instead of the chief executive, who is by law entrusted with such matters.

Whatever the duties and prerogatives of the Attorney General were at common law, his right or duty to act as legal adviser of the officers or departments of State in insurance matters was not one of them. Regulation of insurance matters was unknown to the common law up to the time when the common law was adopted as a part of our system of laws, and in this State insurance is a matter altogether for statutory regulation. The duties of the Attorney General are not prescribed by the constitution, except that he is to perform such duties as may be prescribed by law. Unquestionably, the legislature has a right to require the Attorney

General to perform such legal duties as may be necessary in behalf of the insurance department or in insurance matters, and for the same reason that he may be required to act, and as these matters are altogether matters of statute law, it would seem that the legislature has the further right to relieve him of those duties by providing for other attorneys or counsel for the insurance department. We have held repeatedly that when an office which the legislature has the right to create has been created by statute, such office is wholly within the control of the legislature creating it, (*People* v. *Loeffler,* 175 Ill. 585, and cases cited,) and it necessarily follows that the legislature has the full power to prescribe the duties pertaining to that office and declare what officers shall manage its affairs and what appropriations are necessary therefor. While it is not the duty of courts to question the wisdom of such laws as the legislature has the right to enact, it may be said that in view of the fact that insurance law is a branch by itself and that the insurance business is one of the most important matters with which the State authorities have to deal, the legislature, in creating an insurance department and placing all matters relating to insurance in the hands of a superintendent of insurance, saw fit to allow the Insurance Superintendent his own counsel, who would be in touch with him and responsible to him in much the same manner that many large private businesses retain individual attorneys who are skilled in the particular lines in which they are engaged and who are employed to devote their time exclusively to such matters.

As to the right of the complainant in the original bill to maintain this suit, it is true that we have held that a tax-payer may resort to a court of equity to prevent the misapplication of public funds. With the exception of the appropriations mentioned and those disposed of on their merits by the foregoing opinion, this case in no way involves the misappropriation of public funds or the expendi-

ture of such funds for what is claimed to be or could reasonably be deemed an improper or unlawful purpose. The cases cited in support of the right of a tax-payer to maintain this suit involved different questions from those presented in the case at bar. In all those cases there was involved but the simple proposition whether in the final outcome of the suit money would be saved to all the tax-payers. In this suit an individual tax-payer, while attacking certain relatively unimportant appropriations, has, in effect, asked for the construction of certain other appropriation measures which are by far the most important matters involved, thereby risking an adverse decision and imperiling the interests of all the tax-payers in the State to that extent, and by the ultimate action of this court in declaring the Governor's veto of certain appropriations unlawful, the result has been, in that respect alone, to materially increase the burden of the tax-payers. No such alternative was involved and such an outcome was not possible in the cases cited. In the case of *Jones* v. *O'Connell*, 266 Ill. 443, the only question in controversy was whether a county treasurer had the right to retain and appropriate to his own use certain fees which would otherwise be the property of the State or county. In the case of *Burke* v. *Snively*, 208 Ill. 328, there was involved an appropriation for the maintenance of the Illinois and Michigan canal, and the only issue involved was whether or not such appropriation was unconstitutional. This court held that such appropriation was unconstitutional because of the constitutional provision directly prohibiting an appropriation of money from the State treasury in aid of the said canal. In the case of *Adams* v. *Brenan*, 177 Ill. 194, it was held that a tax-payer may maintain a bill in equity to enjoin a board of education from appropriating school funds to a purpose not warranted by law. In the case of *City of Chicago* v. *Nichols*, 177 Ill. 97, it was held that a tax-payer of a city could enjoin an illegal or unauthorized diversion of the public funds of the munici-

pality or the execution of illegal contracts or the incurring of illegal indebtedness. The question involved was the right of the city council of the city of Chicago to make an appropriation for additional lights in excess of the amount provided in the annual appropriation bill of the year for which the lights were to be used, except in case of casualty or accident happening after such appropriation was made. In the case of *Stevens* v. *St. Mary's Training School,* 144 Ill. 336, it was held that a court of equity had the power to enjoin the appropriation and payment of county funds in aid or support of sectarian schools or any school controlled by a church or religious denomination, such an appropriation being prohibited in express terms by section 3 of article 8 of the constitution. In the case of *Littler* v. *Jayne,* 124 Ill. 123, it was held that a tax-payer could enjoin the State House Commissioners from making or approving vouchers for the expenses incurred in making certain statues to be placed in the State house on the ground that the contract for this work was not made by advertising for bids, in compliance with the law which authorized such work to be done, and a misappropriation of the public money was threatened. In the case of *McCord* v. *Pike,* 121 Ill. 288, a bill was filed to enjoin the sale of property belonging to the county for a lower price than had been offered for it, and it was held that if an unjust and illegal burden was attempted to be imposed on the tax-payers by county authorities, or the money or property of the county, to replace which taxes must be levied, is being wasted or squandered, any tax-payer will have such a direct interest as will authorize him to maintain a bill to enjoin the threatened burden or illegal act. *Jackson* v. *Norris,* 72 Ill. 364, was for an injunction to restrain the mayor and city council of a city from donating the funds of the city to a manufacturing company, a private corporation, and it was held that a court of equity will entertain a bill on behalf of tax-payers to relieve against such misappropriation of public corporate

funds. In *Chestnutwood* v. *Hood,* 68 Ill. 132, a bill was
filed by tax-payers to enjoin the corporate authorities of the
county from issuing bonds in aid of a railroad enterprise.
The question of issuing such bonds had been submitted to
the voters of the county at an election as provided by law,
and it appeared that a majority of all those voting at such
election had not voted in favor of such bond issue. *Perry*
v. *Kinnear,* 42 Ill. 160, was an injunction suit to restrain
a county clerk from issuing an order, and the county treas-
urer from paying such order, issued pursuant to authority
of the county board for the amount of an appropriation
from county funds to pay a judge of the circuit court in
addition to the salary allowed by law. In *Colton* v. *Han-
chett,* 13 Ill. 615, it is held that a tax-payer had the right
to enjoin the supervisors of a county from appropriating
county funds to aid a private individual in the construction
of a toll bridge.

In all of the above cases in which appropriations were
involved it was the illegality of the purpose of the appro-
priation, as distinguished from the irregularity of the man-
ner of making the appropriation, that gave a court of equity
jurisdiction to entertain such suits. All that was decided in
them was, that when public funds are appropriated or be-
ing applied to an illegal or unlawful purpose a tax-payer
might resort to a court of equity to restrain such illegal
appropriation or misapplication of the public funds. The
reason assigned for entertaining jurisdiction in those cases
was, that if the ultimate objects of such suits were attained
there would be a saving of public funds to the tax-payers
which otherwise would be wasted or squandered and must
be replaced by a new tax levy and the burdens of the tax-
payers to that extent proportionately increased. Such is not
the situation presented by this case. Instead of money be-
ing saved to the tax-payers just the reverse is true. Apply-
ing the reasoning upon which the decisions in those cases
are based to the situation presented by the case at bar, it

will be seen appellees have no standing in a court of equity to maintain this suit.

As to the character of the appropriations chiefly complained of in appellees' bill, there is no pretense but that the purposes for which such appropriations were made were legal and lawful or that it was the duty of the General Assembly to make adequate appropriations for such purposes. On the contrary, the contention is that the Governor's veto of certain items is invalid, and that appropriations were made for certain State officers in the Omnibus Bill which should have been made in another bill,—the State officers' pay bill. Conceding that the Governor has no power to veto appropriation items in part, I am unable to see how the invalidating of such veto would in any manner inure to the benefit of the tax-payers of the State. The ultimate effect of raising that question is to increase—not decrease— the amount of such appropriations, in the aggregate amounting to hundreds of thousands of dollars, the burdens of the tax-payers being to that extent increased. As to those held to be State officers for whom appropriations were made in the Omnibus Bill, it is not claimed that they are not State officials and as such entitled to their salaries, and in an amount, in the aggregate, appropriated for that purpose. On the contrary, it is admitted that they are such officers, as it is charged in the bill that they are State officers but the appropriation for their salaries was improperly included in the Omnibus Bill. It being conceded that they are State officers, charged with the duty of rendering services to the State, it was incumbent upon the General Assembly, and it was in duty bound, to appropriate funds for the payment of their salaries, which can neither be increased nor decreased during their several respective terms of office. The General Assembly in making these appropriations had done no more than was its legal duty, but in an irregular manner.

While it is true that the constitution defines what is an office and what an employment, it cannot be said but that the nature of the services performed by certain officials in the various departments of the State government are in many instances of such character that their status as officers or employees cannot be readily distinguished and determined. This is well illustrated here, where neither the counsel for the respective parties, the learned chancellor who heard the cause or this court agree as to the status of every officer or employee for whom an appropriation was made in the Omnibus Bill; and to hold that a court of equity will stay the levy and collection of State taxes at the instance of any tax-payer until, after all the delays incident to a proceeding in that form and an appeal to this court, it has been ascertained in each instance whether or not all of the persons for whom appropriations are made are officers or employees, is carrying the doctrine of the cases cited in the majority opinion entirely too far. While, of course, these appropriations should be properly made, there was not such error committed by the legislature in merely getting some of these appropriations in the wrong bill as justifies, under all the circumstances, the action of a court of equity in setting them aside and thereby destroying the functions of certain of the most important branches of the State government. The State acts only through its employees and officers. The bill seeks to tie up the State Public Utilities Commission, the grain inspection department, the Live Stock Commission, the State Highway Commission, the Mine Rescue Commission, and many others, amounting in all to over a hundred different lines of employment in the various departments of the State. As long as such officers as the Auditor and Attorney General have been elected by the people, and whose duty it is to guard the interests of the people in the matter of bringing suits on behalf of the State or which concern all the people of the State, it would seem that before a suit of this kind

would be entertained by any court they should be consulted in the matter, and should be allowed some discretion as to bringing such suits before imperiling the interests of all other tax-payers of the State, with the unfortunate result that has been reached by the decision in this case. If they should refuse to bring such suits then the matter could be properly presented to the court by an aggrieved tax-payer to compel them to act.

Analogous, in principle, to the right of a tax-payer to enjoin the improper expenditure of public money is the right to enjoin the collection of an illegal tax. In the case of *DuPage County* v. *Jenks*, 65 Ill. 275, in discussing the right of an individual to restrain the collection of taxes, this court, speaking through Mr. Justice Walker, on page 281 said: "It may be, and is, no doubt, true, that many of the citizens of these towns felt themselves under at least a moral obligation to lend the necessary support to the State, county, town and municipal governments under which they lived and by which they were protected in their persons and property, and were willing to waive any irregularities that may have intervened in levying these taxes. They, no doubt, felt the duty they owed to support the State and county governments by paying these taxes. They seem to have had no disposition to engage in a cause that would tend to embarrass the State and to disorganize the county and stop the administration of justice, even if the tax was not technically correct in the mode in which it was levied. * * * It cannot be held that a litigiously disposed person may, on his own motion, file a bill in his own name and on behalf of all other tax-payers of the county, and stop the collection of all the revenue for the support of the State, the county, townships, cities, towns, schools and other municipalities. Our government is not, and never can be, at the mercy of one or a few individuals thus to bring it to an end by the forms of law. To so hold would be a perversion of the purposes for which a court of chancery

was created, and would be a power never conferred, destructive to the peace and good order of society, if not to the government itself. Such a power can never be exercised by any court. It would be revolutionary and highly dangerous to all our institutions." In *Knopf* v. *First Nat. Bank of Chicago,* 173 Ill. 331, it was held that a bank may file a bill in equity to enjoin the collection or extension of an illegal tax on its stockholders, and a number of former decisions of this court are cited in support of such holding in which such suits had been entertained. A distinction, however, is made between those cases and the case of *DuPage County* v. *Jenks, supra,* which applies with peculiar force to the facts in the case at bar. It was held in the *Knopf case* that the decision in the *DuPage County case* was unquestionably right. The language above quoted was set out in the opinion, and it was further said: "That case involved the entire machinery and existence of all government within those towns. The decision does not rest on the ground that a single wrongful act, which by its general nature inflicts the same injury upon every tax-payer, may not be prevented and relief given to all at the suit of one, but it involved considerations of the existence and administration of government, and when such considerations and questions of public policy are involved they restrain or supplant the exercise of the power of the court, and sometimes even deny what would otherwise be a remedial right in the individual. The decision did not deny or limit the right of the individual to demand action even in such a case, but did require that his right should be limited to himself in a case where it could not be presumed that the other tax-payers desired to stop the administration of the government and where such disastrous consequences would surely result. The principle does not apply to mere cases of misrule in particular matters, such as are involved in this case, where it cannot be presumed that the tax-payers desired the imposition and collection of an illegal burden,

if it should be found to be such." These two cases well illustrate the distinction between the case at bar and the cases cited in the majority opinion sustaining the right of an individual tax-payer to maintain such a suit.

The appropriations to the State Treasurer for refund of taxes and the appropriation for the expenses of various commissions created by joint resolution are in the same category as the appropriations attacked in the Omnibus Bill. They were for proper purposes, but the appropriation to the Treasurer should have been for a definite amount and the commissions should have been created by regular enactment instead of by resolution.

No matter what motive prompted this proceeding, as a result of the unfortunate action of one tax-payer in instituting the suit not only have the appropriations and consequent burdens of all of the tax-payers been materially increased by reason of the action of this court in nullifying the veto of the Governor as to parts of certain items, but the only possible result will be the necessary calling together of the General Assembly in special session, at an additional expense and burden to all the tax-payers, to properly provide the necessary funds with which to carry on the departments of the State government that are involved or else abandon them. As to the personal interest of the complainant in the original bill in the subject matter of this suit, the amount of the tax against his property is infinitesimal and the objections he urges to the appropriations in question are highly technical. If this were a suit in *mandamus* against the Attorney General or the Auditor of Public Accounts or other proper officer to compel him to institute this suit, the court would have the right to exercise a broad discretion in granting or refusing to award the writ, and would consider the interest of the complainant in the suit and the public inconvenience and embarrassment in the administration of State affairs that might ensue by awarding the writ. (*People* v. *Lieb,* 85 Ill. 484.)

In my judgment a tax-payer has no right to institute a suit of this character in his own name, or in behalf of himself and all other tax-payers of the State similarly situated, which he could not compel the proper State officer, under like circumstances, to institute in behalf of himself and all other citizens of the State. Courts of equity are not established for the purpose of deciding academic questions. Under the holding of the majority opinion a different rule is adopted, and any tax-payer of any county in the State now has the right to file a bill in chancery in the circuit court to enjoin the Auditor from issuing, and the State Treasurer from paying, warrants to the various officers and employees of the State because of some alleged irregularities in the enactment of the law making the appropriations for which the warrants are drawn. In self-protection these officers are justified in withholding the issuance and payment of such warrants until the matter can be heard and finally determined by the courts. This, in some instances, may take several months. In the meantime all of the employees and officers concerned are deprived of their compensation legitimately earned. This means that the entire business of the State will be hindered, embarrassed and in some instances stopped. The various State departments which have been affected and whose work has been hampered by this proceeding have been mentioned. A suit against a municipality, such as a county, city or town, or an officer thereof, to prevent an illegal and unlawful appropriation of its funds to a purpose not authorized by law, which will in no way hinder or embarrass such municipality in the performance of its legitimate corporate powers, duties and functions, or a suit against an officer to prevent him from converting to his own use public funds in violation of law, presents an entirely different situation from the case at bar, where State officers are enjoined from paying to other State officers and employees their legal and lawful salaries, and thereby the machinery

of a sovereign State is thrown out of order. The consequences of such proceedings are bound to work a hardship, and in this case have worked a hardship, on many of the officers and employees of the State whose pay is involved and have interfered with their necessary duties in behalf of the State. If such cases are to be tolerated it is bound to result in hopeless confusion and disorganization of the State government.

There was no equity in the bill, and it should have been dismissed.

Mr. JUSTICE DUNCAN, dissenting:

Section 23 of article 5 of our present constitution provides that "the officers named in this article shall receive for their services a salary to be established by law, which shall not be increased or diminished during their official terms, and they shall not, after the expiration of the terms of those in office at the adoption of this constitution, receive to their own use any fees, costs, perquisites or office, or other compensation." In pursuance of this constitutional provision our present statute provides that there shall be allowed and paid an annual salary, in lieu of all other salaries, fees, perquisites, benefit or compensation in any form whatsoever, to the Governor the sum of $12,000, together with the use and occupancy of the executive mansion; to the Lieutenant-Governor the sum of $2500, and if the powers and duties of the office of Governor shall devolve upon the Lieutenant-Governor he shall during such emergency be entitled to the emoluments thereof; and to the Superintendent of Public Instruction the sum of $7500. In pursuance of the constitution the compensation of the members of the legislature was fixed by statute at $2000 for the period for which members of the house are elected, and ten cents per mile for each mile necessarily traveled in going to and returning from the seat of government at each

270 — 24

session, and $50 per session for each member, which shall be in full for all incidental expenses.

From a careful consideration of the foregoing provisions of the constitution and of the statutes on salaries it clearly appears that the legislature intended that the sum of $2500, annually, should be the full compensation for the services and personal expenses of the Lieutenant-Governor when not serving the State as Governor. The legislators knew, when passing the statute on salaries, that as president of the senate he would be required to travel to and from the seat of government during the sessions of the legislature, the same as the other members thereof, and they also well knew that he could legally receive no other or further compensation as salary, in any form, than the sum that they were then fixing for him, by subsequent legislation during his term. It is, however, not material to determine what was the purpose or intent of the legislature in passing the various provisions of the Salaries act, as it is the clear intent and purpose of said constitutional provision to prohibit the increase or decrease of the salaries of all State officers by way of further allowances, in any form, during their terms of office. The salary of an officer is just as certainly increased by an allowance to him of railroad fare, hotel bills or cigar bills paid by him during his term as if he had been allowed a like sum as salary in an act denominating the sum as increased salary. It is well understood that a person who takes an office takes it *cum onere,* and is legally bound to perform the duties thereof for the salary or refuse to qualify, or resign in case he has qualified. If it be admitted that the present salary of the Lieutenant-Governor is not ample for his services and that the legislature ought to have allowed him his necessary expenses for travel in the first instance, the constitution, nevertheless, prohibits any such further allowance during his term. There can be no doubt that the legislature then had full right and power to specifically allow a sum, in addition to

his salary, for his necessary expenses had it seen fit to do so. The constitution, however, in my judgment, absolutely prohibited any change or addition to the salary of Lieutenant-Governor during his term by way of an additional allowance for personal expenses or otherwise, and the rule is too important to the public to allow any infringement thereof whatever.

For like reasons above given I think the following appropriations to the Superintendent of Public Instruction should be held to be invalid, to-wit: "For conducting three county examinations, $1500 each, setting questions and correcting manuscripts, $4500 per annum; for conducting State examination, setting questions and correcting manuscript, $250 per annum; for conducting examinations for medical colleges, $1400 per annum." The objection to these items specifically stated is that the sums are made payable personally to the superintendent for his services in the particulars named. If the said sums are to be paid to or for any other employees or persons to render the services therein named, and not to the superintendent for his own use and for his own services, it should clearly so appear by the appropriation itself, so that it may be known whether or not it is a valid appropriation, or an invalid one for the purpose of increasing the salary of the superintendent. I recognize the right and power of the legislature to at any time provide for the payment to the superintendent or any other State officer sufficient sums to pay for the legitimate expenses of his office, such as stamps, office supplies and other legitimate expenses growing out of the maintenance thereof. I recognize, also, that it is legitimate for the legislature to provide for assistants and employees necessary to have the office properly conducted, and to appropriate to the officer fixed and definite sums to pay said assistants and employees the definite compensation fixed for their services, when the work of the office becomes so onerous that the officer cannot himself fully perform it. When,

however, the allowance to the officer is an expense purely personal to the officer, caused by his going to and from his office, and not in pursuance of the duties of his office, or for his personal support or enjoyment while in office, such as car fare or hotel and cigar bills, or when the additional allowance is made to him for his own use, either for services rendered by him or by his assistants or employees who are otherwise provided for and paid, then such allowances are illegal and void because in contravention of the constitution.

For the foregoing reasons I respectfully dissent from that portion of the opinion supported by the majority of the court that holds valid the appropriation of $2000 to the Lieutenant-Governor for traveling expenses and the said appropriations to the Superintendent of Public Instruction.