(No. 77-CC-148⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

MITCHELL WARE, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed March 19, 1985.*

CHARLES LOCKER, for Claimant.

NEIL F. HARTIGAN, Attorney General (GLEN P. LARNER, Assistant Attorney General, of counsel), for Respondent.

ROE, C.J.

The case at bar presents for consideration several complex and important issues, all of which are matters of first impression before this Court. It is fortunate, therefore, that the facts of the controversy are essentially undisputed, thus enabling the Court to focus on the law applicable to these novel matters.

The Claimant, Mitchell Ware, filed his complaint in August of 1977, and following some threshold motions

brought by the Respondent before the full Court, the claim was assigned to a commissioner for a full hearing. Over 22 separate hearings, arguments and motions were held over an extended period of time, eight witnesses testified extensively, 33 exhibits were received into evidence, and divers motions were filed as were many hundred pages of briefs in support thereof and in opposition thereto.

From this lengthy record, the following material facts emerge as either uncontroverted or proved by the preponderance of the evidence:

Findings of Fact

1. The Claimant, Mitchell Ware, an attorney licensed in the State of Illinois, after serving many years in various law enforcement capacities as, *inter alia*, deputy superintendent of Chicago police, chief of Illinois Narcotics Bureau, etc., was, in August of 1969, appointed by then Governor Richard Ogilvie to the post of chief of the Illinois Bureau of Investigation (I.B.I.). The principal function of that agency was to investigate and bring to justice matters involving narcotics, organized crime and specially assigned "difficult" or "sensitive" cases.

2. The I.B.I. consisted of, and Claimant supervised, over 100 officers. These officers were initially trained at the policy academy in Springfield and thereafter received ongoing training and continuing education from various State and Federal agencies.

3. The I.B.I. was assigned, on a permanent basis and at all material times herein, an Assistant Attorney General, appointed by then Attorney General William J. Scott.

4. Prior to and subsequent to 1969 the I.B.I. owned

and used, in the normal course of its activities, diverse electronic surveillance devices and equipment, including such items as "Cal Sets" (transmitters and recorders), "Schmitt Devices" and Bell & Howell Recorders. In addition, the agency from time to time borrowed similar surveillance equipment from various State, county, and Federal law enforcement offices.

5. In late 1969 at Zion, Illinois, Claimant and other officers of the I.B.I. attended a law enforcement seminar sponsored by Illinois Attorney General Scott. Among others participating in this activity were Charles Rogovin (U.S. Department of Justice), G. Blakely (senate judicial committee), and A. Rody (assistant customs inspector). Materials presented included voices of organized crime figures on tapes and obtained from surveillance devices, training in the use and application of electronic equipment, and training in the use of various surveillance techniques, including the use of "cheese boxes," parallel microphones, mouthpiece inserts, "leeches," wall transmitters, "cube mikes," recorder brief cases, parabolic microphones, pair registers, etc. Attendees were trained in the use, purchase, detection, and installation of all of this equipment.

6. In 1970 a meeting of the Illinois Law Enforcement division's task force on organized crime took place. In addition to the Claimant herein, present were Herbert Brown from Governor Ogilvie's staff, Marlin Johnson, head of the Chicago, Illinois, office of the Federal Bureau of Investigation, Joel Flaum, now U.S. district court judge, then first assistant U.S. attorney, and Edward Hanrahan, then State's Attorney of Cook County, Illinois. At said meeting the Claimant requested a Federal grant to purchase for his agency the electronic

surveillance equipment recommended to him at the 1969 Zion seminar.

7. Thereafter, the Claimant received a grant from the U.S. Justice Department to purchase said equipment and did, in fact, purchase for his agency room transmitters, Schmitt devices, body transmitters, and telephonic surveillance devices. All purchase orders were processed by the State of Illinois in the normal course.

8. Training of I.B.I. agents included proper procedures in the use of electronic surveillance; to wit, prior to use, permission was asked and had to be obtained from the State's Attorney of the county in which surveillance was to occur. Claimant Mitchell Ware had no authority to give such permission nor did he ever do so.

9. In the spring of 1970, then Governor Richard Ogilvie personally directed the Claimant, Ware, to investigate the attempted murder by bombing of State Representative Barr. The investigation of this crime, thought to be connected with organized crime and the Jayne murder, was accomplished in concert among the I.B.I., State's Attorneys of Cook County and Will County, the F.B.I., the Will County sheriff's office and the Joliet mayor's office. Various electronic surveillance techniques were employed. All participants in the investigation were made aware of all activities, and investigation status reports were made directly to Governor Ogilvie. Claimant Ware, however, did not personally participate in any portion of the investigation, but did report results thereof to the Governor on at least six occaisions.

10. In 1976, the F.B.I. informed the Claimant that

the purchase by him of surveillance equipment and its use by his agency were being investigated for possibly being in violation of Federal criminal laws. The Claimant duly informed then Attorney General Scott and Assistant Attorney General James Zagel, who denied any duty to defend or represent him in connection with the investigation, and thereupon the Claimant engaged private counsel (Eugene Pincham and Sam Adam). The Claimant was indicted by a Federal grand jury, as was his successor in office, Richard Glicke. The *gravamen* of the indictment was for the illegal purchase and use of electronic surveillance equipment and conspiracy in connection therewith.

11. On several occasions, both before the indictment and thereafter, orally and in writing, the Claimant made claim upon the Attorney General for representation and/or reimbursement for legal fees expended. Each such request was denied.

12. After a three-week trial before Federal Judge George Leighton, a directed verdict was ordered. The court commented to the jury that at all relevant times the Claimant was simply performing his assigned duties of office.

13. Claimant's attorneys, Pincham and Adam, in addition to attending and participating in the three-week trial, attended at least 90 meetings with the Claimant and witnesses. Substantial time was also expended in other discovery, meetings with co-counsel Thom Foran, etc.

14. The Claimant and his counsel had agreed upon legal fees of $75,000.00. In the opinion of the Court, this amount was fair and reasonable, taking into account the complexity of the matters, expertise of counsel, time expended, and custom and comparable fees charged

and paid in the community for similar services under similar circumstances.

15. The Attorney General had never authorized payment or reimbursement for attorney fees of State officers or employees incurred in the defense of criminal cases as a matter of policy.

16. At no time in the case did the Attorney General make any investigation whatever to determine the nature of the indictment, whether it was the result of performance of an illegal duty, etc.

17. At the time in issue (1976), the Attorney General had a budget of $924,900.00 available for payment of legal fees to part-time or special assistant attorneys general.

Conclusions of Law

Section 4 of "An Act in regard to attorneys general" (Ill. Rev. Stat., ch. 14, par. 4) defines the Attorney General's duties, *inter alia*, as follows:

"Third—To defend all actions and proceedings against any state officer, in his official capacity in any of the courts of this state or the United States."

Paragraph 6 of the same chapter, in discussing certain situations where the Attorney General is unable to attend a proceeding, states:

"Whenever the Attorney General . . . is . . . unable to attend . . . any cause or proceeding, *civil or criminal, which it is or may be his duty to prosecute or defend* . . . ."

It seems clear to us that the quoted statute imposes an absolute duty, in certain instances, upon the Attorney General to defend or pay for the defense of public officials in criminal as well as civil cases. This statutory obligation is conditioned upon the thrust of the action (or indictment) being premised upon an act resulting from performance of an official act or in furtherance of

an official duty. Paragraph 6 specifically contemplates this protection being extended to criminal matters.

In the instant case it is abundantly clear that Claimant's indictment was based entirely upon his alleged law violations in and about the performance of his official duty; to wit, the purchase and use of electronic surveillance equipment. Thus, it was the statutory duty of the Attorney General to either provide Claimant with a defense or to pay for such a defense by appointing a "special assistant" for such purpose.

The Respondent basically advanced four arguments:

First, that in no case is the Attorney General ever obliged to tender a defense to a public official in a criminal case. Although this has heretofore been the policy, we feel that it is contrary to the express mandate of the legislature.

Second, that in any event, Claimant was not indicted for performance of duty. A fair reading of the indictment and interpretation thereof belies this defense. At no time was the Claimant accused of any act for his personal benefit or for that of any other individual, nor for any form of bribery, corruption, misfeasance or nonfeasance.

Third, that even if all other defenses fail, the Attorney General may not be held accountable for any error committed with regard to an act of discretion for which he has immunity. *The true issue, however, is not whether the Attorney General erred in his discretionary conclusion as to whether or not a defense was owed but rather whether or not he exercised or attempted to exercise any discretion at all.*

Respondent explains that although it might appear

that discretion plays no part in a policy that applies to all criminal actions, regardless of the facts involved, the discretion is in the creation of the policy rather than its actual administration. We disagree. We find that the facts prove beyond any reasonable doubt that there was no exercise of discretion at all. At no time were the facts weighed or considered and a conclusion reached that no defense should or could be tendered (which would have been an exercise in discretion). Rather, it is clear that the Attorney General decided without any consideration of the actual facts and arbitrarily that no defense was due. This is not a discretionary error.

Fourth, that the doctrine of *Fergus v. Russell* (1915), 270 Ill. 304, 110 N.E.2d 130, would somehow be violated by an award in this case. Briefly stated, that case held that the Attorney General has the exclusive authority to represent a public official or interest of the State in litigation. Clearly the *Fergus* rule has no application to a case such as the one at bar where the Attorney General was asked for representation and refused before any obligation to outside counsel was incurred. This distinction is equally applicable to *Dunlop v. State* (1917), 3 Ill. Ct. Cl. 107, and *Fusek v. State* (1975), 31 Ill. Ct. Cl. 170.

For the above reasons, it is hereby ordered that the Claimant, Mitchell Ware, be and hereby is awarded the sum of $75,000.00 in full and final satisfaction of this claim.